JUDE G. GRAVOIS, Judge.

STABLE OF CONTENTS

INTRODUCTION.'...■.488
ASSIGNMENTS OF ERROR.488
PROCEDURAL HISTORY ..489
FACTS .:..:.490
ASSIGNMENT OF ERROR NUMBER FIVE Sufficiency of the evidence.....:.501
ASSIGNMENT OF ERROR NUMBER ONE First Amendment violation — free exercise of religion .506
ASSIGNMENT OF ERROR NUMBER TWO Failure to grant motion for a continuance..-.⅛⅛:.513
ASSIGNMENT OF ERROR NUMBER THREE Improper allotment of defendant’s case.518
ASSIGNMENT OF ERROR NUMBER FOUR Violation of La.C.Cr.P. art. 673 after motion for recusal filed . .522
ASSIGNMENT OF ERROR NUMBER SIX Denial of defendant’s expert witness testimony ..524
ASSIGNMENT OF ERROR NUMBER SEVEN Violation of right to a 'speedy trial....;..\.'. 1.. 528
ASSIGNMENT OF ERROR NUMBER EIGHT Violation of right to confrontation.532
ASSIGNMENT OF ERROR NUMBER NINE Improper composition of the Grand Jury.:...533
ASSIGNMENT OF ERROR NUMBER TEN State pursued a bad-faith indictment and prosecution against Mr. Errol Victor Sr., LS and Mrs. Tonya Victor, LS. The prosecution as a whole was contrary to medical evidence and gender driven to the detriment of Mr. ■ Errol Victor. [Gender Discriminatory Motives]!.]..534
ASSIGNMENT OF ERROR NUMBER ELEVEN Jurisdiction and Status.535
ASSIGNMENT OF ERROR NUMBER TWELVE Defendant complains that she was brought before a Court which lacked competent, jurisdiction to conduct proceedings against her due to pending judicial district-wide motion to recuse dll judges of the 40th JDC and. because defendant denied corporate status. Defendant avers that these proceedings have root in vindictive prosecution because the D.A. and his staff were political and business enemies of defendant and the judicial process was utilized to execute personal retribution against defendant. The case before the court is a complete derivative of the twice-dismissed cases: 2008-CR-165; 2010-CR-172, (66175, 66575 66576, 46420). Aresultmt *488 acquittal from abandonment of legal appeal, res nova violation is claimed by defendant. ¾ ©a
ERRORS PATENT REVIEW. 05 co
JsCONCLUSION. 05 co 10

J[¿INTRODUCTION

Defendant, Tonya Otkins-Victor, was convicted by a jury of the manslaughter of her son, the minor child M.L. Lloyd, III (“M.L.”). On appeal, she argues multiple assignments of error as noted below. After thorough review, we find no reversible error, and affirm defendant’s conviction and sentence.
ASSIGNMENTS OF ERROR[1]
1. The trial court abused its discretion in conducting trial on a Saturday, on defendant’s Sabbath day, violating her right to the freedom of exercising his [sic] religious beliefs under the First Amendment of the U.S. Constitution and Article 1, § 3 of the Louisiana Constitution of 1974.
2. The trial court abused its discretion when it denied defendant’s 6th Amendment Right to Counsel of Choice, because counsel wanted a few days on a continuance to get familiar with a few issues in the case before enrolling and representing him [sic] at trial.
3. Defendant’s due process and equal protection rights was [sic] violated when her case was erroneously allotted “judge shopped” to another court division and assigned a new case number after a re-indictment, while other re-indicted cases similar situated remained in the original allotted divisions and kept the same case numbers.
4. Defendant was denied her rights of a fair proceeding and due process of law when all the judges of the 40th JDC could not act, because a motion to recuse was filed on all the 40th JDC judges.
5. The Evidence Presented in The Trial Court Was Insufficient to Convict Defendant of Manslaughter Murder.
6. The Trial Court Abused Its Discretion by Restricting Defendant of The Right to Present an Expert Witness on Her Own Behalf And Restricting Evidence Showing Lack of Credibility of Witnesses.
7. Defendant Rights to a Speedy Trial Rights [sic] Was Violated on State and Federal Levels[.]
8. Defendant Was Deprived of Her Rights to Confront and Cross-examine Coroner During Trial.
9. Unconstitutional Jury-fixing Resulting in Discrimination and Tainted Jury Pool Requiring Disqualification of All Jurors (6th, and 14th Amend)
hid. State pursued a bad-faith indictment and prosecution against Mr. Errol Victor Sr., LS and Mrs. Tonya Victor, LS. The prosecution as a whole was contrary to medical evidence and gender driven to the detriment of Mr. Errol Victor. [Gender Discriminatory Motives][.]
11. When Through Negative Averment of Jurisdiction “Status” and “Jurisdiction” Are Placed at Issue, the *489 Burden Shifts to the Purported Party Asserting Competent Jurisdiction.
12. Defendant complains that she was brought before a court which lacked competent jurisdiction to conduct proceedings against her due to pending judicial district-wide motion to recuse all judges of the 40th JDC and because defendant denied corporate status. Defendant avers that these proceedings have root in vindictive prosecution because the D.A. and his staff were political and business enemies of defendant and the judicial process was utilized to execute personal retribution against defendant. The case before the court is a complete derivative of the twice-dismissed cases: 2008-CR-165; 2010-CR-172, (66175, 66575, 66576, 46420). A resultant acquittal from abandonment of legal appeal, res nova violation is claimed by defendant..
PROCEDURAL HISTORY[2]
On April 1, 2008, the eight-year-old boy M.L. Lloyd, III, was brought to the emergency room at River Parishes Hospital in St. John the Baptist Parish, unresponsive, by his mother, defendant Tonya Otkins-Victor, his step-father, codefendant Errol Victor, Sr. (“Mr. Victor”),[3] and his stepbrother, Errol Victor, Jr. Emergency room personnel were unable to revive M.L. During emergency treatment, after M.L.’s clothes were removed, it was discovered that his backside from his neck to his knees was covered in deep bruises. Other injuries were discovered as well: M.L.’s buttocks were both scraped, he had wounds on his forearm, and an injury to his neck.
On April 16, 2008, defendant Tonya Ot-kins-Victor was charged by indictment with accessory after the fact to first degree murder and cruelty to a juvenile. On the same day, co-defendant Mr. Victor was charged by indictment |nwith one count of first degree murder, in violation of La. R.S. 14:30.[4] Defendant’s case was randomly allotted to Division “A” under case number 2008-CR-165 of the 40th Judicial District Court, Judge Madeline Jasmine presiding. Defendant pled not guilty at arraignment.
On September 22, 2009, both defendant and Mr. Victor’s charges were amended by indictment to second degree murder, while engaged in the perpetration of the crime of cruelty to a juvenile, in violation of La. R.S. 14:30.1(A)(2)(b). Defendant subsequently filed a motion to quash the indictment, which was granted on February 4, 2010. In written reasons, Judge Jasmine determined that the indictment must be quashed because of the “participation of the St. John the Baptist Parish Sheriffs Deputy in the grand jury process as a grand juror while wearing a shirt which openly advertised his employment with an office inherently aligned with the State.” After initially filing for reconsideration and/or an appeal of the judgment, on April 6,2010, the State filed a notice of dismissal *490 without prejudice of all pending charges in case number 2008-CR-165.
Six days later, on April 12, 2010, a newly empaneled grand jury re-indicted defendant and Mr. Victor with second degree murder, while engaged in the perpetration of the crime of cruelty to a juvenile, in violation of La. R.S. 14:30.1(A)(2)(b). The case was randomly allotted to Division “B,” case number 201Ó-CR-172 of the 40th Judicial District Court, Judge Mary Hotard Becnel presiding. Defendant refused to enter a plea at arraignment; the trial court entered a plea of “not guilty” on her behalf. Defendant filed multiple pre-trial motions, including a Motion to Recuse all of the judges on the 40th Judicial District Court on May 12, 2010, and an “Objection to ‘Allotment’ of Case to Division ‘B’ and Motion for Transfer to Division of Original Allotment Division ‘A,’ ” on May 17, 172010.[5] All hearings on motions were stayed until the motion to recuse was heard by appointed ad hoc Judge Frank Foil on July 1, 2010. Judge Foil denied the motion to recuse. The motion to transfer to the originally allotted division was heard on August 4, 2010, and denied with written reasons on August 18, 2010.
Trial was originally scheduled to begin on August 16,2011. However, defendants, who were out of jail on bond pending trial, did not appear in court on that day. It was later determined that they had absconded from the State of Louisiana. Defendants were located in Tifton, Georgia, in April 2012, whereupon they were extradited to the State of Louisiana to face the pending charges.
Trial commenced before a twelve-person jury as to* both -defendants on July 22, 2014. On August 1, 2014, the jury found defendant guilty of the responsive verdict of manslaughter.[6] Prior to sentencing, defendant filed several post-verdict motions, including a motion for post-verdict judgment of acquittal,' motion in arrest of judgment, and motion for a new trial, all of which wére denied by the trial court on August 25, 2014. On September 15, 2014, defendant was sentenced to twenty-one years' imprisonment at hard labor without the benefit 'of probation or suspension of sentence. The trial court further ordered defendant’s sentence to run consecutively with any other sentence defendant may have been serving.[7]
Pursuant to defendant’s oral motion for appeal made immediately after sentencing, the trial court granted defendant an appeal on September 24, 2014.[8] Defendant’s timely appeal follows.[9]

J^FACTS ■

On April 1, 2008, defendant’s eight-year-old son, M.L. Lloyd, lit, died as a result of *491 injuries consistent with an extensive and severe beating.[10]
Dr. Richard Tracy, an expert'in the field of forensic pathology, testified that he performed the autopsy on M.L. on April 2, 2008, the day after M.L. died. Dr. Tracy noted that M.L. had sustained extensive bruising over most of his torso, ■ from the base of his neck to his buttocks, on both thighs, and also along his left forearm. The internal examination of M.L. confirmed that the bruising was deep tissue bruising, nor was there lividity.[11] Over the lumbar and gluteal[12] region, Dr. Tracy also identified impressed abrasions, which in his experience indicated that M.L.’s exposed back and buttocks area had been slid over a rough surface. Based on the appearance of the abrasions, Dr. Tracy concluded that they occurred close in time to the child’s death.
During the course of the autopsy, Dr. Tracy also observed distinctive “u-shaped” impressed bruise marks.. In one location, the impressed marks displayed a pattern indicative of a doubled-over cord, such as an extension cord. Present on the front of M.L.’s body were also larger more circular patterned bruises and a bruise across the neck area caused by a hard object pressed across M.L.’s- windpipe at an angle. In Dr. Tracy’s opinion, the bruises were likely two to three days old and were sustained as a result of blunt force trauma.
| aUpoh internal examination, Dr. Tracy determined that M.L. also suffered from a bruised lung, an injury sustained shortly before his death. He further opined that extensive deep bruising over a large portion of a child’s body could cause death. He explained that extensive deep bruising brings about cardiovascular collapse, because the bruising causes a large volume of blood to seep into the tissues, impairing circulation. Dr. Tracy opined that the cause of, M.L.’s death could have been either the result of the extensive, confluent deep bruising which caused cardiovascular death, or by asphyxia through the use of a blunt object pressed across M.L.’s windpipe, or both.[13]
Defendant, Mr. Victor, and Mr. Victor’s son, Errol Victor, Jr., brought M.L. to the emergency room, but defendant and Errol, Jr. left within minutes, leaving Mr. Victor there. Registered nurse Clay Hubble was the first medical professional to come, into *492 contact with M.L. Mr. Victor told him that the child had “an accident in the bathroom.” According to Nurse Hubble, the child was slumped over and not breathing.
Emergency room physician Dr. Dale Morris confirmed that upon M.L.’s arrival at the hospital, he was limp, unresponsive, had no heartbeat, his pupils were fixed and dilated, and he was cold to the touch. M.L.’s body temperature was 85.2 degrees upon arrival, more .than fourteen degrees lower than the average rectal temperature of 99.6 degrees, plus or minus. Dr. Morris and Nurse Hubble noted that they saw no evidence of trauma until M.L.’s clothes were removed, at which point bruises on M.L.’s thighs, back, buttocks, chest, and abdomen were visible, along with the abrasions on his buttocks and lower back.
|10Nurse Hubble attempted to locate Mr. Victor to find out what happened to the child, and saw him in the parking lot of the hospital speaking with someone whom he believed to be defendant, who was seated inside her car.' Mr. Victor was eventually escorted into the waiting room of the hospital, and when asked what happened to M.L.,' Mr. Victor told Nurse Hubble, “we had to discipline him” because he was stealing. Although Mr. Victor would not respond when asked if he hit M.L., he did state, “I take full responsibility for this.”
The registration clerk at the hospital, Nico Savoie, testified that upon M.L.’s arrival at the hospital, defendant approached her and stated that her son was in the ambulance bay short of breath. Defendant then left the hospital with her stepson, Errol, Jr. Ms. Savoie testified that she attempted to obtain M.L.’s name and date of birth, to no avail. Rather, defendant told Ms. Savoie that her son had been to the hospital a couple days prior and that he had Medicaid. Ms. Savoie was eventually able to obtain M.L.’s name from Mr. Victor, after which she discovered that M.L. had never been treated at River Parishes Hospital as defendant had claimed.
M.L. was ultimately pronounced dead twenty minutes after his arrival at the hospital when efforts to resuscitate him failed.[14] Dr. Morris opined that M.L. had probably been dead for a while; he stated that it would have taken over an hour for a person’s body temperature to drop to 85.2 degrees.
St. John the Baptist Parish Sheriffs Officer Alkan Traveler, Sr. was dispatched to River Parishes Hospital regarding a juvenile victim later identified as M.L. When Officer Traveler arrived at the hospital in response to the call, he spoke to Dr. Morris and also observed that M.L. had numerous bruises on his thighs, buttocks, and lower back. After speaking with Dr. Morris, Officer Traveler | n approached Mr. Victor, who was in the' waiting room with his attorney, Tregg Wilson, where he was asked to accompany Officer Traveler to the police station. Captain Kenneth Mitchell of the St. John the Baptist Parish Sheriffs Office, who had also arrived at the hospital pursuant to the dispatch call, advised Mr. Victor of his Miranda[15] rights and then instructed Officer Traveler not to speak to defendant diming his transport to the police station. While transporting Mr. Victor to the police station, Officer Traveler overheard Mr. Victor speaking to someone whom Officer Traveler believed to be *493 defendant on the telephone, advising her not to speak to “the police or anyone else/’ and to make sure the children did the same. He further stated, “what has happened has happened and [I] cannot change the past. ... [Y]ou. lost a son today and you’re about to lose your husband to.prison.” According to Officer Traveler, Mr. Victor also stated that he would take “full responsibility” for what happened. Once at the police station, Captain Mitchell again advised Mr. Victor of his Miranda rights in the presence of his attorney. No statements were obtained, and Mr. Victor was arrested.
Detective Christie Chauvin, also of the St. John the Baptist Parish Sheriffs Office, likewise arrived at River Parishes Hospital in response to a call made by a hospital employee regarding an unresponsive child “covered in bruises.” Upon arrival at the hospital, Detective Chauvin learned from the hospital staff that the child had died and that the mother of the child had left the hospital.[16] Detective Chauvin testified that she was familiar with Mr. Victor and knew that he had other children, so she requested that a patrol deputy be dispatched to their home to ensure the safety of the other children. The officers dispatched to defendant’s I ahorne discovered that no one was present and that defendant’s vehicle was also not there.
Pursuant to Captain Mitehell’s request, Tregg Wilson, Mi-. Victor’s attorney, agreed to contact defendant and urge her to return to her residence.[17] Defendant eventually returned to the residence' and was taken to the police station,for questioning. The Cadillac Escalade she was driving was. searched, revealing over $180,000 in cash, as well as an envelope with attorney Mr. Wilson’s phone number on it.[18] Once at the police station, defendant was placed under arrest and read her Miranda rights.
Captain Mitchell testified that defendant and Mr. Victor were originally scheduled for trial in this matter on August 16, 2011; however, they did not appear in court for trial. Defendant and Mr. Victor were eventually located in April of 2012 in Tif-ton, Georgia, and extradited to Louisiana for trial.
Dr. Scott Benton, an expert in the field of pediatrics and child abuse pediatrics, was retained by the State to evaluate the case and testified at trial. As part of his evaluation, Dr. Benton reviewed the following documentation: the investigative report .from the Sheriffs Office; the certificate of death; the autopsy report and associated toxicology report; the River Parishes Hospital emergency record; treatment records from M.L.’s prior treating physician, Dr. Angelo Lobue; relevant photographs; and the testimony provided at certain pretrial hearings conducted in this matter. After his review of the. documentation, Dr. Benton opined that M,L, died as a “consequence of injuries that were definitively sustained by physical *494 abuse.”[19] When reviewing the autopsy photographs, Dr. Benton found | iSit of particular interest that M.L. had sustained numerous “patterned” bruises over portions of his body. He explained that patterned-bruises take the shape or image of the object that caused the bruise. He noted that the bruising that took the shape of a looped pattern could have been from a cord, a belt, or an object that had the ability to be “thin or on edge.” Dr. Benton testified that this type of pattern indicates an injury that cannot be self-inflicted. Dr. Benton further noted that the injuries sustained by M.L. involved multiple planes, or surfaces on the body, providing further proof that the injuries were inflicted by someone else. Also, the looped pattern of the bruises indicated to Dr. Benton that M.L. was not clothed at the time they were inflicted.
Dr. Benton testified that the extensive bruising on M.L.’s back that extended all the way down to his buttocks and to the' back of his thighs exhibited a pattern injury consisting of linear patterns and abrasions where the skin had been scraped off by the object used to hit M.L. These injuries further confirmed to Dr. Benton that M.L. was not clothed at the timé the physical abuse was inflicted. He further testified that the linear pattern seen on M.L.’s backside was indicative of M.L. being struck with a broad paddle or a belt multiple times.
Additionally, Dr. Benton opined that the injuries sustained to M.L.’s forearm were of importance because they indicated that M.L. attempted to block the hits that were inflicted upon him. He further noted that there appeared to be “grab marks” or restraint marks ’ over M.L.’s lower wrist and upper arm. Dr. Benton concluded that in his opinion, strong contributors to M.L.’s death were the severe bruising to his back and torso, and/or asphyxia by compression of the neck. He opined that to a reasonable degree of medical certainty, M.L. suffered unjustifiable pain and suffering and died as a result of cruelty.
| uLieutenánt Pat Baudoih, director of the Chiid Advocacy Center in St, Charles Parish, testified that she interviewed Toi Williams, Brandon Williams, Cordell Williams, and Kevin Otkins, M.L.’s half-brothers. Their' statements were introduced into evidence.
Toi Williams, who was twenty-one years old. at the.time of trial, testified at trial that at the time his half-brother M.L, died, six years prior to trial, he was fifteen and living with Mr, Victor (his stepfather) and defendant, as, well as his brothers (Brandon Williams and Cordell Williams) and half-brothers (M.L., Kevin Otkins, Ian Victor, and Jaubert Victor), along with Mr. Victor’s sons (Errol, Jr., Trent, Fabian, Marcus, Emmanuel, and Chance Victor). Toi said that he and his brothers were home-schooled in a business.building Mr. Victor owned near their home, Toi recalled that the day before M.L. died, he and his brothers were at the building where they were home-schooled, and Mr. Victor had given each of (them an ice cream before they left for the day. When they arrived home,. Mr. Victor told them that he had discovered that someone had stolen an ice cream and he wanted to know who had taken it. According to Tói, a few of the boys were whipped, including M.L., whom Mr. Victor whipped with a belt. Later, after M.L. admitted to taking the ice cream, Mr. Victor sent the other boys upstairs and continued to beat M.L., “throwing him around,” and punching him *495 in the chest. Mr. Victor then proceeded to throw M.L. against the stairs.
Toi testified that Mr. Victor told M.L. to wait outside on the porch because he was going to call the police. According to Toi, the police arrived, but he was unaware whether ■ M,L. had spoken with - them. M.L. was eventually brought back inside the house and denied dinner that night. Toi recalled that once inside, Mr. Victor continued to beat and punch M.L. The next morning, Mr. Victor dragged M.L. out of bed and again began, beating M.L. and “slinging” him around. -Toi Instated that he, Errol, Jr., and Emmanuel were then ordered to restrain M.L. Toi testified that he was eventually-replaced by another one of Mr. Victor’s sons because he wasn’t “holding him tight enough.” Toi recalled that M.L.’s face, wrists, and legs were pinned down while Mr. Victor and Fabian (pursuant to Mr. Victor’s order) beat M.L., who had been stripped down naked, with a belt. Toi testified that the beating lasted for an hour or longer.,..
During the beating, Mr. Victor called defendant upstairs to witness- -the- beating where she watched and cried, but did not physically or verbally attempt to stop Mr. Victor. Toi stated that he observed bruises on M.L.’s arms and scratches on his backside that were bleeding from the belt used to beat him. He further recalled that Mr. Victor put alcohol on the scratches and then continued to beat M.L. According to Toi, the beating stopped for - a few moments while Mr. Victor and defendant went outside to tend, to, some housework, but when Mr. Victor returned inside, he went back upstairs and continued beating M.L. Toi stated that he could hear Mr. Victor “throwing M.L. around.”
Later, Mr. Victor instructed his son Fabian to go to the store to pick up ice and Pedialyte. After Fabian returned from the store, Mr. Victor then ordered Brandon to retrieve clothes for M.L. because they were going to take him to the hospital. Toi testified that -he observed Mr. Victor take his laptop- upstairs with him. Toi assumed that Mr.'Victor was trying to find out- what was wrohg with M.L. because he stated that M.L. was not breathing. M.L. was eventually taken to' the hospital by defendant, Mr. Victor, and Errol, Jr. Defendant then returned from the hospital a- short time later, at which time she gathered'■ the children and left the house. Toi testified that ‘defendant was crying and talking about driving to Tennessee. Toi recalled that while in the car, defendant received a phone call that |1fithe police were at their house. On their way home, defendant instructed her .children not to say anything to the police, stating, “You’re doing this for M.L.” - - ■
Toi’s twenty-year-old brother, Brandon Williams, corroborated Toi’s account of the events surrounding M.L.’s death. Brandon confirmed that the day before M.L. died, they were at Mr. Victor’s office building where they were home-schooled. He also recalled .that before recessing for the day, Mr. Victor gave .them each an ice cream. . When they had returned to the house, Mr., Victor stated that an ice cream was stolen and he wanted to know who had taken it. Brandon testified that Mr. Victor blamed him and his half-brother M.L. Mr. Victor then whipped both Brandon and M.L. with a belt. According to Brandon, M.L. eventually confessed to taking the ice cream, so Mr. Victor instructed his son Trent to whip M.L. because he said “Trent whooped the hardest.” He recalled that Mr. Victor then ordered M.L. to go outside because he was going to call the police. Later that evening, Brandon was told that he was not allowed to eat dinner, so he went upstairs and could hear M.L. crying while Mr. Victor hit him.'
*496 The next morning, Brandon recalled that Mr. Victor pulled M.L. out of bed and continued to beat him with a belt while Errol, Jr. and Emmanuel held him down by his wrists and legs. Brandon testified that when Mr. Victor was done whipping M.L., he sat down and instructed his other sons, either Marcus, Trent, or Fabian, to continue the beating while Mr. Victor asked M.L. if he was sorry for what he had done. Brandon stated that the beating went on for approximately two hours. At one point, Brandon recalled defendant being called upstairs by Mr. Victor to watch the beating and that she told Mr. Victor to stop because she did not want to see it.
Once the beating stopped, Brandon testified that M.L. could not move and looked tired'. Later, Mr. Victor eventually returned to M.L.’s room, where |17Brandón could hear “a lot of bumping,” before he was called upstairs to gather M.L.’s clothes. Brandon testified that when he went upstairs, defendant was putting ice on M.L.’s stomach and attempting to get M.L."to say “momma,” but he would not respond. According to Brandon, Mr. Vic tor then began to look up M.L.’s medical condition on the computer before determining whether or not to take him to the hospital. Brandon testified that Mr. Victor stated he was going to “wait a couple of minutes ... to see if M.L. going to come back,” and if not, he would take him to the hospital. Brandon recalled -that Mr. Victor then went to change his clothes stating, “If I go out, I’m going to go out clean.” After waiting approximately five minutes and realizing M.L. was not going to be all right, defendant, Mr. Victor, and Errol, Jr. took M.L. to the hospital.
Brandon further testified' that Mr. Victor instructed defendant to leave town and drive to Tennessee, but that defendant did not want to go, so they returned to the house where she advised her sons not to say anything about what had happened.[20]
Cordell Williams[21] also corroborated Toi and Brandon’s testimony as to the events leading up to M.L.’s. death. He confirmed that Mr. Victor whipped Brandon and M.L. with a belt because he believed one of them had stolen an ice cream sandwich. Cordell further testified that once M.L. admitted to taking the ice cream, Mr. Victor whipped him with the assistance of his son Trent on the evening of March 31, 2008. Cordell recalled that M.L. was sent outside for a couple of hours before being brought inside where Mr. Victor beat him again with his fists, hitting him in the face, punching him in the chest, and kicking him.
| isEarly the next morning, Cordell observed Mr. Victor pull M.L. out of bed and continue the beating. Mr. Victor then called everyone into M.L.’s room where M.L. was on the floor, face down, and Mr. Victor was beating him with a belt. Eventually M.L.’s ¡clothes were removed and the beating continued by one of Mr. Victor’s sons at Mr. Victor’s instruction. Cordell stated that he observed M.L. bleeding on his backside. He further recalled that Mr. Victor, stated “I’m going to keep whopping you until I see tears come out your eyes.”
Cordell also confirmed that at one point, Mr. Victor called defendant upstairs to watch. Cordell testified that defendant was crying and saying she didn’t want to watch. She told Mr. Victor to stop, but only once. Cordell testified that the beat *497 ing went on for a long time before Mr. Victor went back downstairs. Cordell testified that he was downstairs with his brothers, helping in the garden, when he saw Mr. Victor go back upstairs and heard “a lot of bumping,” as if Mr. Victor was throwing M.L. against the wall. Cordell recalled that after twenty or thirty minutes, Mr. Victor instructed Errol, Jr. and his other son Fabian to go to the store to purchase ice and Pedialyte. After they returned from the store, Brandon was instructed to gather clothes for M.L. before M.L. was taken to the hospital. Cordell testified that M.L. was not moving when they carried him to the car. Cordell further confirmed that they were going to drive to Tennessee until defendant changed her mind and decided to go back home, where she instructed her sons to he about their original plan.
Kevin Otkins confirmed the same accounts as relayed by Toi, Brandon, and Cordell, recalling that M.L. was beaten by Mr. Victor with a belt for two days over a stolen ice cream.
Marcus, Emmanuel, and Chance Victor, Mr. Victor’s biological children, refused to-speak during their interviews at the Child Advocacy Center, but testified |19for the defense at trial, along with Fabian and Trent Victor, providing a different account of the events from their stepbrothers Toi, Brandon, Cordell, and Kevin.
Marcus Victor testified that he was not present at the building where they were home-schooled the day before M.L.’s death. However, he recalled that later that evening, at their house, Mr. Victor had a discussion with his sons about stealing. He noted that Cordell, Brandon, Toi, and Kevin were not cooperating, and that Mr. Victor stated that he was going to Tennessee for two weeks and that if their behavior continued, everyone that did not have the last name “Victor” would have to leave when he returned. Marcus testified that there were no “spankings or whippings” on that day. He further recalled that Mr. Victor sent M.L. and Brandon to bed that night without dinner. This, however, was contradictory to Marcus’s statement provided to the Office of Community Service (“OCS”) during which he stated that M.L. was whipped by Mr. Victor six times before being sent to bed.[22]
The following morning, Marcus recalled that defendant was angry with M.L. for his behavior on the previous day so she “whoop[ed] him bad.” Marcus further testified that while this was occurring, Mr. Victor was not at home and that neither he, Fabian, nor Errol, Jr. beat M.L. Once Mr. Victor returned home, he called a family meeting upstairs, where he informed his stepsons that they had to leave the house. According to Marcus, after the meeting, Cordell, Toi, Brandon, and M.L. remained upstairs and were “fussing with each other.” Later, M.L. stated that he was not feeling well, so Mr. Victor and defendant went upstairs to check on him. Marcus testified that it was at this time that they discovered M.L. was not breathing. According to Marcus, Mr. Victor performed CPR on M.L. before driving him to the hospital.
laoWhen questioned as to Mr. Victor’s disciplinary practices, Marcus testified that Mr. Victor would discipline him and his siblings by having them run laps around the house. However, he then admitted that when he provided a statement to OCS, he stated that Mr. Victor disci *498 plined him by whipping.[23] Marcus further testified that he never mistreated his stepbrothers and that it was his stepbrothers that would fight amongst themselves.
Fabian Victor, another of Mr. Victor’s sons, denied restraining M.L. while Mr. Victor beat him. He further testified that his father had a “no whipping policy,” and that he would discipline his children by having them write down Bible scriptures or run laps. Fabian recalled that on the evening before M.L. died, Mr. Victor had M.L. and Brandon' stand on the porch and wait for the police as a “scare tactic” for stealing. He further stated that Mr. Victor then sent M.L. and Brandon to bed that night without dinner and that neither M.L. nor Brandon were beaten or whipped that day. However, the next morning, Fabian testified that defendant -called a family meeting and told her sons that they were going to have to live with their biological fathers because they .-were being disobedient. According to Fabian, defendant then whipped M.L. and Brandon with a belt for “what they did the day before.” He testified that he saw defendant whip M.L. three or four times, but noted that he also did not stay for the entire whipping. Fabian testified that Mr. Victor was not at home that morning and that his father never whipped M.L. He further stated that he never saw any marks or bruises on M.L. and that when defendant whipped him, he was wearing his clothes. Fabian testified that after | aiM.L. was taken to the hospital, he and some of his brothers drove to Home Depot when they received a call from defendant telling them to return home.[24]
Emmanuel Victor testified that on the day before M.L.’s death, M.L. was not whipped. He testified that on the morning of M.L.’s . death, Mr, Victor wa.s not at home, and that he saw defendant whipping M,L. with a belt for stealing ice cream.[25] Sometime later, Emmanuel recalled that defendant called a family meeting where she informed her sons that if they did not behave appropriately, they would be sent to live with their biological fathers. He testified that after the meeting, Toi, Brandon, Cordell, and Kevin stayed upstairs with M.L. According to Emmanuel, noises were heard from upstairs prompting defendant to return upstairs to find Cor-dell beating M.L. He further testified that he was told M.L. suffered from an asthma attack.
Trent Victor testified that on the morning of April 1, 2008, he came out of the bathroom and witnessed defendant whipping M.L. with a belt. He.further stated that at that time,, his father was not at home; Trent testified that later that morning, after defendant conducted a family meeting, he went upstairs and observed Brandon and Cordell fighting M.L. in the bedroom closet.[26] Trent broke up the *499 fight and overheard Brandon and Cordell blaming M.L. for having to be sent away. Trent reported the fighting to - defendant and then went back upstairs to bring M.L. some food. According to Trent, M.L. did not want to eat and was “breathing funny.” At that time, defendant instructed one of her sons to call MrJ^Victor.[27] Trent testified that when his father left for the hospital with M.L., he and some of his siblings went to Home Depot. Police officers were at the house upon their return.
Chance Victor testified that on the morning of M.L.’s death, he woke up to “commotion” and was instructed by defendant to go downstairs and watch his younger brothers, Ian and Jaubert. Chance testified that Mr. Victor was eventually called to come back home because M.L. was not feeling well. Once Mr. Victor arrived home, Chance recalled that defendant, his father, and Errol, Jr. left to take M.L. to the hospital. Chance further testified that defendant admitted to whipping M.L., but that he did not personally observe defendant whipping M.L. He noted that Cordell, Brandon, M.L., and Toi had behavioral problems. After the incident, Chance declined to give a statement to ÓCS.
Kerry Brown testified that he knew Mr. Victor because he had represented him in a civil legal matter. He testified that Mr. Victor had sought his advice regarding discipline problems he was having with defendant’s children and alternative schooling options. He recalled that Mr. Victor had a tiered discipline structure and that a neighbor complained about one of Mr. Victor’s disciplinary techniques which ■involved his children running laps around their home. Mr. Brown further testified that after the Victors were indicted, defendant went to his house and told him that “this thing with Errol is: all wrong because Errol wasn’t even there” and that defendant told him she “beat the kids.” Mr. Brown also testified that he never personally saw Mr: - Victor engage in' physical violence. "
. Defendant took the stand to testify for Mr. Victor after being informed of her Fifth Amendment rights. She testified that when Mr. Victor asked her to marry him, she informed him that -her sons, Toi, Brandon, Cordell, Kevin, and M.L. had | ^behavioral issues. Defendant. admitted that on the day of M.L.’s death, she spanked.Toi, Brandon, and Cordell, ahd also “chastised”[28] M.L. She further maintained that Mr. Victor was not present on the morning of M.L.’s death. She then testified that she had a meeting with her sons that morning during which she told them she was tired of their “behavioral problems.” Defendant testified that after the meeting, everyone went downstairs except for Toi, Cordell, and M.L. While downstairs, defendant stated that she heard tussling and fighting going on upstairs. Her stepson Trent advised her that Cordell was fighting with M.L. in the bedroom closet. Defendant then went upstairs and asked M.L. what had happened, to which M.L. replied, “Cordell fighting me and he was fighting me because he said that I told on him .... that he took the ice cream instead of me.” After M.L. stated that he was “going to be alright,” defen-darit testified that she whipped Cordell.
*500 Sometime later, defendant went back upstairs to check on M.L. and witnessed Toi, Brandon, and Cordell fighting M.L. Defendant admitted, however, that she provided a voluntary written statement on June 26, 2009, in which she made no mention of Brandon, Toi, or Cordell fighting with M.L., nor mentioned Trent having to break up a fight between Cordell and M.L. (The first time defendant mentioned Brandon and Toi fighting with M.L. was in a statement dated December 15, 2010.) She stated that the reason they were fighting was because she had previously told them they would have to live with their biological fathers because of their behavioral issues. At one point, defendant testified that she and Mr. Victor had entertained the idea of giving Mr. Victor’s sister custody of Cordell because he would bully his younger brothers Ian, Jaubert, and M.L.
^Defendant testified that Mr. Victor did not whip, beat, kick, or hit M.L. the day before or on the day of his death. She further testified that on the day of M.L.’s death, M.L. stated that he was tired and could not breathe, so she had one of her sons call Mr. Victor and tell him to come home because there was an emergency.[29] When Mr. Victor arrived home on April 1, 2008[30] and saw M.L., he believed M.L. was dehydrated, so he sent one of his sons to buy Pedialyte and ice. Defendant also noted that Mr. Victor sought medical advice from a doctor on the internet,[31] and pursuant to the advice received, immediately took M.L. to the hospital.[32] Defendant stated that she saw bruises on M.L.’s body, but not to the extent shown in the autopsy photographs. Defendant testified that M.L. was coherent and lucid for a portion of the mile and a half drive to the hospital.
Defendant explained that she did not remain at the hospital after M.L. was dropped off at the emergency room because she had to bring Errol, Jr. back home.[33] When she returned home, she noticed that some of her children had left, so she called and instructed them to come back to the house because she was going to drive back to the hospital. According to defendant, while en route to the hospital, Mr. Victor called her and told her that M.L. was dead and that he had been arrested. Defendant then returned to the house where she was arrested.
Robert Taylor testified that he attended church with Mr. Victor’s brother, and because he became interested in the Victors’ case, a meeting was arranged between himself and defendant. During one of the meetings, defendant invited Mr. |25Taylor to her house to record a statement she wanted to make for the public. In the video, defendant declared that Mr. Victor was not present when she chastised M.L. Mr. Taylor also testified that defendant stated that Mr. Victor did not approve of her whipping the children.
*501 ASSIGNMENT OF ERROR NUMBER FIVE[34]

Sufficiency of the evidence

Defendant assigns as error the sufficiency of the evidence used to convict her of manslaughter. She claims that the State failed to prove the cause of M.L.’s death. Defendant further contends that the State relied on the fabricated testimonies of her sons Toi, Cordell, and Kevin, in support of its position that Mr. Victor repeatedly beat M.L. causing his death. She asserts that their testimonies are in direct conflict with Mr. Victor’s sons Marcus, Fabian, Emmanuel, Trent and Chance’s testimonies, which established that Mr. Victor was not home on the day of M.L.’s death. She further contends that her'testimony in which she accepted blame for disciplining M.L. but not for causing his death also conflicts with the testimony brought forth by the State’s witnesses. Defendant' asserts that the State presented a “flip-flop prosecution” by suggesting that Mr. Victor killed M.L., while also putting forth a case that defendant’s “spanking” of M.L. killed him. As a result, she maintains that two different verdicts (second degree murder for her husband and manslaughter for her) were reached based on two different theories of prosecution. She further concludes that the State’s witnesses’ testimonies were in conflict with the physical evidence and should not be considered credible.
12f,The State argues that the evidence presented was sufficient to convict defendant of manslaughter. The State avers that the medical and physical evidence, and defendant’s confession, along with the testimony of her children, led to the -reasonable conclusion that defendant and Mr. Victor caused M.L.’s injuries ultimately resulting-in his death. The State maintains that defendant’s actions hastened thé termination of M.L.’s life, or contributed me-diately or immediately to his death, in a degree sufficient to be a clearly contributing cause, sufficient to support defendant’s conviction.
The appropriate standard of review for determining the sufficiency of the evidence was established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). According to Jackson, the standard is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. at 319, 99 S.Ct. 2781. Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does riot require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. State v. Flores, 10-651 (La.App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122.
Rather, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Id.; Jackson, supra; see also State v. Holmes, 98-490 (La.App. 5 Cir. 3/10/99), 735 So.2d 687, 690; State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). It is not the *502 function of the appellate court to assess .credibility or re-weigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442, 443. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept- or reject, in whole or in |27part, the testimony of any witness. State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 84, writ denied, 03-2745 (La.2/13/04), 867 So.2d 688.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission, of an offense, La, R.S. 15:438 provides that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. This is not a separate test from the Jackson standard but rather provides a helpful basis for determining the existence of reasonable doubt. Id. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id.
In the present case, defehdant was charged with second degree murder while in perpetration of the crime of cruelty to a juvenile, but was convicted of the responsive verdict of manslaughter.[35]
Evidence that would support a conviction of a charged offense would necessarily support a conviction of an authorized responsive verdict or lesser included offense. State v. Simmons, 01-0293 (La.5/14/02), 817 So.2d 16,19. Manslaughter is an authorized responsive verdict to' a charge of second degree murder. La. C.Cr.P. art. 814(A)(3). W/hen a defendant does not object to a |2Slegislatively. established responsive verdict, the defendant’s conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State v. Johnson, 11-336 (La.App. 5 Cir. 2/14/12), 91 So.3d 365, 371, writ denied, 15-0044 (La.5/22/15), 170 So.3d 984; see also State v. Harris, 02-1589 (La.5/20/03), 846 So.2d 709, 712-13; State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983).
Here, defendant did not object to the responsive verdict of manslaughter prior to the jury rendering its verdict. The evidence must support either the responsive verdict returned or the crime charged. Harris, 846 So.2d at 715. In the instant matter, the evidence was sufficient to support the charged offense, as the jury could have found that defendant acted as a principal to the second degree murder of M.L.; thus, we find defendant’s contention that *503 the evidence does not support her conviction for manslaughter is without merit.
In the jury instructions given at the trial, the trial judge instructed the jury as to' the law of principals as follows: “[a]ll persons concerned in the commission of a crime are principals and are guilty of the crime charged if, whether present or absent, they directly commit the act constituting the crime, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.” La. R.S. 14:24. Thus, the jury could’ have convicted defendant of the murder of M.L. even if they believed that she did not personally inflict the fatal injuries he suffered.
The trial judge also instructed the jury on the definition of second degree murder. Under. La. R.S. 14:30.1(A)(2)(b), at the time of the offense,[36] second degree murder, while in ^perpetration of the crime of cruelty to a juvenile, is defined as, “the killing of a human being: ... [w]hen the offender is-engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.” This section of La. R.S. 14:30.1 contains the circumstances under which a defendant can. be found guilty under the felony murder rule, which dispenses with the necessity of proving mens rea accompanying a homicide; the- underlying felony supplies the culpable mental state, State v. Small, 11-2796 (La.10/16/12), 100 So.3d 797, 805. The underlying felony that defendant was charged with was cruelty to a juvenile, which is defined in La. R.S. 14:93(A)(1) as the “intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.”
Thus, in order for the State to prove that defendant was guilty of second degree murder pursuant to La. R.S.' 14:30.1(A)(2)(b), it had to establish eithér: (1) that defendant intentionally mistreated or neglected M.L.; or (2) that defendant was criminally negligent in her mistreatment or neglect of M.L. The term “intentional” within 'the meaning of this statute requires general criminal intent to cause a child unjustifiable 'pain and suffering. State v. Cortez, 96-859 (La.App. 3 Cir. 12/18/96), 687 So.2d 515, 519 (citing State v. Morrison, 582. So.2d 295 (La.App. 1 Cir.1991)), Mistreatment, as used in this statute, means “abuse.” Cortez, 96-859, 687 So.2d at 519. (citing State v. Comeaux, 319 So.2d 897, 899 (La.1975)).. Moreover, to-be criminally negligent in her mistreatment or neglect of the child, a defendant must have such disregard for the interest of the child that the conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. State v. Porter, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115, 123; see also La.R.S. 14:12;
On April 1, 2008, defendant and Mr. Victor dropped off an unresponsive eight-year-old boy at the emergency room of River Parishes Hospital. Upon arrival at the hospital, defendant’s, son, M.L., had no heartbeat, his pupils were fixed and dilated, and he was cold to the touch. Based on his body temperature, emergency room physician Ur. Morris opined that M.L. had likely been dead for “a while.” Bruises were also observed, all over M.L.⅛ body, concentrated on his back. In response to a nurse’s question to him to *504 determine what had happened to the child, Mr. Victor stated to a nurse attending to M.L., “we had to discipline him” because M.L. was stealing. Mr. Victor further stated to both hospital personnel and a law enforcement official that he would take “full responsibility” for what happened.
While Mr. Victor remained at the hospital, defendant quickly left the- premises. Despite her son’s dire condition, the video footage taken from the hospital cameras confirmed that defendant only remained at the hospital for a total of two minutes and twenty seconds before leaving. During this brief period of time, registration clerk Nico Savoie attempted to obtain • M.L.’s personal information- -but to no avail. Upon learning that defendant had hurriedly left the hospital, Detective Chauvin dispatched officers to defendant’s home, concerned for the safety of defendant’s other children. The officers arrived to an empty house, later learning that defendant had taken her children and had reached Des-trehan, Louisiana, before she was urged by Mr. Victor’s attorney to return to their residence. Defendant’s sons testified that while on their way home, defendant instructed them not to talk to the police, stating “You’re doing this for M.L.”
[ 31 Forensic pathologist, Dr. Tracy, performed the autopsy on M.L. He testified regarding the extensive, widespread bruising that covered M.L.’s body, which included circular patterned and distinctive “u-shaped” bruise marks. Dr. Tracy also testified regarding a bruise across M:L.’s neck area, which he opined was caused' by a hard object pressed across M.L.’s windpipe. He explained that such extensive deep tissue bruising over a large portion of a child’s body could cause death. Thus, Dr. Tracy concluded that the cause of M.L.’s death could have been either the result of the extensive, confluent deep bruising which caused cardiovascular death, or by asphyxia through the use of a blunt object pressed across M.L.’s windpipe, or both. This evidence was uncon-troverted.
After reviewing the evidence in this case, Dr. Benton, an expert, in the field of pediatrics and child abuse pediatrics, opined that M.L. died as a “consequence of injuries that were definitively sustained by physical abuse.” He explained that the patterned bruises observed on M.L.’s body were likely produced by a cord, a belt, or a thin object and that a child could not inflict such injuries upon himself. Dr. Benton further testified regarding the defensive wounds seen on M.L.’s forearm and the restraint marks found on his wrists and upper arms. Dr. Benton concluded that in his opinion, strong contributors to M.L.’s death were the severe bruising to his back and torso and/or asphyxia by compression of the neck. He opined that to a reasonable degree, of medical, certainty, M.L. suffered unjustifiable pain and suffering and died as a result of cruelty. The purpose of presenting the evidence of the painful nature of the injuries suffered, by M.L. and the fact that they were not inflicted accidentally, but instead were intentionally inflicted, was to negate any claim of accidental injury and to prove the ■ elements of cruelty to a juvenile.
^Additionally, all four of defendant’s children, Toi, Brandon, Cordell, and Kevin, testified consistently with one another and with the physical evidence in this case. It was their testimony that Mr. Victor beat M.L. with a belt over the span of two days after learning that M.L. had taken an ice cream without permission. They recalled the horrific details surrounding the beating, including Mr. Victor’s instruction to his older sons to restrain M.L. during the severe beating while defendant watched, with minimum interference. Toi also recalled the delay in transporting M.L. to *505 the hospital despite the fact that M.L. was not breathing and the instruction given by defendant not to talk to the police.
Defendant’s stepchildren, Marcus, Emmanuel, and Chance, provided a different account of the events leading up to M.L.’s death. They all claimed that defendant whipped M.L. on the day of his death and that their father, Mr. Victor, was not home at the time. They also maintained that M.L.’s clothes were on while he was whipped, which was inconsistent with the physical evidence of the patterned bruising and M.L.’s scraped buttocks. Defendant’s stepson, Trent, also testified that later that morning, he went upstairs and observed Brandon and Cordell fighting with M.L. Lastly, at trial, defendant admitted to “chastising” M.L. on the day of his death and maintained that Mr. Victor was not present at the time. She further stated that she observed Toi, Brandon, and Cor-dell fighting M.L. later that day. It is noted as well that defendant’s various statements successively add more details regarding the fact and extent of the brothers’ fighting with M.L., details that were not mentioned in the first statement,. as noted above in this opinion.
The jury was presented with the conflicting testimonies of defendant’s children, her stepchildren, and her own admission that she “whopped” M.L. but, according to defendant, did not cause his death. The jury chose' to ‘believe the Instate’s witnesses over the defense witnesses. The jury’s conclusion regarding the credibility of the witnesses is dependent upon its in-court observation, and when faced with a conflict in testimony, the jury is free to accept or reject, in whole or in part, the testimony of any witness. See State v. Alexander, 12-836 (La.App. 5 Cir. 5/23/13), 119 So.3d 698, 702, writ denied, 13-1981 (La.3/21/14), 135 So.3d 614; State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052,1056. It is the fact-finder who weighs the respective credibility of the witnesses, and this Court will generally not second-guess those determinations. See State v. Hughes, 05-0992 (La.11/29/06), 943 So.2d 1047, 1051. The jury, faced with the physical evidence in this case coupled with the witness testimony presented , by both the State and the defense, was within its discretion to believe thfe State’s witnesses regarding the severe and extensive beating committed upon M.L. by Mr. Victor while defendant stood by, refusing to significantly intervene or seek timely medical treatment for M.L.’s injuries.
In order to convict defendant of second degree murder the State could have proved defendant actually caused the fatal injuries or that she was a principal to the crime. It appears defendant’s alternate hypothesis of innocence, namely, M.L.’s alleged past medical history being a large contributing factor in the cause of his death, was rejected by the jury and that defendant’s conduct of essentially idly standing by while her son was beaten to death over the span of hours by her husband confirmed her participation as a principal to the crime under La. R.S. 14:24, Moreover, defendant’s actions inside then-home while M.L. was brutally beaten, coupled by her delay in seeking medical' treatment for M.L.’s' injuries and her actions after she dropped M.L.’s lifeless body off at the emergency room of the hospital, further established such disregard for the interest of M.L. that -her conduct | ^amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.[37]
*506 In light of the foregoing, we find that the evidence presented was sufficient under the Jackson standard to support a conviction of second degree murder and, thus, a responsive verdict of manslaughter. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER ONE

First Amendment violation-free exercise of religion

In this assignment of error, defendant argues that the trial court abused its discretion in conducting trial on a Saturday, a day which defendant claimed was her “Sabbath” day, in violation of her right to free exercise of religion under the First Amendment of the United States Constitution and Article I, § 3 of the Louisiana Constitution of 1974. Defendant contends that because of her religious beliefs and the trial court’s refusal to adjourn the trial for that day, she did not participate in the Saturday trial proceedings, a day when the State presented testimony that was prejudicial to her case. As a collateral consequence of her lack of participation, defendant claims that her Sixth and Fourteenth Amendment rights to cross-examine and confront witnesses, to put on a defense, to represent herself, and her right to a fair trial were thus violated. Defendant avers that the State had no compelling interest in holding the trial on Saturday and that the trial judge did nothing to accommodate her right to exercise her religious beliefs. She maintains the court weighed the jurors’ personal obligations and concerns over that of her |aKFirst Amendment right to exercise the freedom to practice her religion by not working on “the Sabbath.” Accordingly, defendant prays that her conviction be reversed and her case remanded for a new trial.
•The State responds that defendant was previously informed that in an effort to conclude the lengthy trial, as well as in an effort to elicit testimony from an otherwise unavailable witness, the trial would continue into Saturday. According to the State, the trial court took into consideration defendant’s objection; however, based on the extraordinary circumstances of the case, the delay it would cause, defendant’s inability to substantiate her religious claim, and the fact that defendant did not inform the court of the asserted conflict until the day before the Saturday in question, the State maintains the trial court did not err in holding court on that day.
Voir dire selection commenced on Tuesday, July 22, 2014. The trial court stated to all prospective jury panels on July 22 and July 23- that there was a possibility that trial would continue on Saturday, and asked if jurors had any problem with that. Defendant, who was present in court, made no objection, -on either of those days. It was not. until the third day of voir dire, Thursday, July 24, 2014,[38] that defendant and Mr, Victor first objected to holding trial on Saturday. Mr. Victor noted that *507 he had heard the judge mention it the day before (July 23), but implied that he had forgotten to object. When the trial court affirmed that it planned to proceed with the trial on Saturday, Mr. Victor, joined by defendant, advised the court that they would be Unable to participate due to their religious beliefs, which required the observance of “the Sabbath” as a day of rest. When asked what religion Mr. Victor practiced, he stated,, “we’re non-denominational.”
The trial court said that it would conduct further research on the issue before rendering a ruling, noting that the jury put their “lives on hold” for the trial, which | ^included making accommodations to work on Saturday as was cleared with the jury earlier during the week and not objected to by defendant at that time. The State further informed the trial court that one of its crucial out-of-state expert witnesses would be unable to testify after Saturday and would likely be unavailable until after the State, had already completed its case.
Testimony in this case began on Friday, July 25, 2014. After testimony concluded, Mr. Victor “went on record” and again stated that he would not work on Saturday, his “Sabbath.” The judge informed the jury that trial would continue on the next day, Saturday. Defendant and Mr. Victor filed a joint written “Objection/Exception/Motion/Notice to the Court (Sabbath)” on Saturday, July 26, 2014, and argued the motion to the court that morning.[39] In the motion, defendants argued that they could not proceed to trial on Saturday, their Sabbath day, because it was a day of “rest” according to their religious beliefs. Attached to defendants’ motion was a “Certificate of Ordination” issued to Mr. Victor by the Reverends of the Spiritual Sunlight Baptist Association. The certificate contained no mention of specific tenets, such as the Association’s observed Sabbath day. Mr. Victor explained that although he-was ordained in this Baptist Association, his current religious membership was “non-denominational.” Mr. Victor and defendant did not identify a particular church they attended. They averred that they, would move for a mistrial if the court proceeded with the trial without their participation in violation of the equal protection clause of the Fourteenth Amendment.
Defendant also spoke, without objection from Mr. Victor; stating:
There’s, there’s an understanding that need to be understand and need.to be understood to clarify to everything we speaking. Ain’t no religion. It’s the faith that we have in God. Simple as that. We never said it was religion. We have the right to responds to that. | S7We’ve been ignored ever since we walked in here. She get misses of time that she wants to get and we act like we in the comer, [sic]
Only thing we follow is the Lord, commandments. Thou shall not, that’s what it is, God, not our' word. So you is disrespecting God in that way? That’s the problem- with God. If we’ve got a problem with us, you got a problem — I don’t care. I we can’t separate that. [sic]
The same day, after listening to the previously made arguments of defendant and the State, the trial court ruled that trial would be held on Saturday. In so ruling, the trial court noted that for the first two days of trial, during voir dire, defendant had failed to object to going forward on Saturday, despite the matter being specifically addressed with each pro *508 spective juror panel in defendant’s presence. The trial judge told defendant that she could participate in trial as she wished, that she could not force her, but that the trial would go forward on Saturday.
Defendant and Mr. Victor again reiterated that they would not participate, and the trial court permitted Mr. Victor to provide the jury with a one sentence explanation as to why they would not be participating in the trial that day. The trial court explained to the jury that it had considered defendant’s objections to working on Saturday, and also factored in the inconvenience to the jurors, court personnel, and justice system as a whole, in reaching its decision to move forward with the trial that day.[40]
On appeal, defendant asserts that her claim that the trial court abused its discretion in conducting trial against her protest on the day of her Sabbath is rooted under the Free Exercise Clause of the First Amendment and Article I, § 3 of the Louisiana Constitution of 1974.
|asIt is a well settled principle of constitutional law that a criminal defendant has the right “to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.” Faretta v. California, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This right is derived from the Confrontation Clause of the Sixth Amendment to the United States Constitution which states that “[i]n all criminal prosecutions, the accused shall enjoy the right . i. to be confronted with the witnesses against him.... ” An accused’s right to be present in the courtroom at every stage of the trial is one of the most basic of the rights guaranteed by the Confrontation Clause. State v. Peralta, 01-149 (La.App. 5 Cir. 1/15/02), 807 So.2d 967, 975, writ denied, 02-0541 (La.1/24/03), 836 So.2d 41 (citing Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)); see also La.C.Cr.P. art. 831. This same right is embodied in Article I, § 16 of the Louisiana Constitution of 1974. Peralta, 01-149, 807 So.2d at 975 (citing State v. Shank, 448 So.2d 654, 657 (La.1984)). However, the right of confrontation is not absolute. Peralta, 01-149, 807 So.2d at 976 (citing Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). It is equally well established that a defendant may waive this right knowingly and voluntarily. See Diaz v. United States, 223 U.S. 442, 456-58, 32 S.Ct. 250, 56 L.Ed. 500 (1912). In addition, a waiver may be inferred from a defendant’s conduct. See United States v. Gagnon, 470 U.S. 522, 528-29, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).
Here, there is no question that defendant’s decision not to participate in the Saturday trial proceeding was knowing. The trial judge stated, “we are still going to court today. If you wish to participate, fine. If you don’t, you don’t have to. I can’t force you to. But we are going forward with trial.” Thus, defendant knew the consequences of her decision not to participate. Rather, the issue to be determined is whether defendant’s choice not to participate was truly “voluntary.”
Lain other words, the issue of the voluntariness of a defendant’s decision to absent himself from court proceedings due to religious observance must be tied to the question of whether the First Amendment requires a trial judge to accede to the defendant’s desire to engage in the particular exercise of his religion. To frame the issue in terms of *509 the -Sixth Amendment’s “voluntariness” requirement: if a criminal defendant had a First Amendment right to be excused from attending trial on a particular day, a judge’s insistence on convening trial on that day would amount to the sort of “coercion” that would render involuntary the defendant’s otherwise intentional decision to absent himself.
Hoyt v. Lewin, 444 F.Supp.2d 258, 276 (S.D.N.Y.2006).
Accordingly, we examine whether the Free Exercise Clause of the First Amendment granted defendant the right to “rest” on her Sabbath day rather than,participate in her trial.
“The Free Exercise Clause of the First Amendment, which has been applied to the states through the Fourteenth Amendment, provides that ‘Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.’” Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). A similar provision is contained in Article I, § 8 of the Louisiana Constitution, which provides, “No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof.” The significance of the right to the free exercise of religion is not diminished by an individual’s status as a defendant in a criminal proceeding. U.S. v. Fisher, 571 F.Supp. 1236, 1238 (S.D.N.Y.1983).
Nonetheless, “not all burdens on religion are unconstitutional.... The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest.” Bob Jones University v. United States, 461 U.S. 574, 603, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (citations omitted). When reconciling a First Amendment right’s issue with important government objectives, such as the “efficient, orderly, and fair administration ofj^criminal justice,” Fisher, supra at 1241, a court must determine (a) whether the state’s proffered purpose is sufficiently compelling, and (b) whether the manner chosen to achieve that goal is the least restrictive means for doing so. See United States v. Lee, 455 U.S. 252, 257-58,102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); Gillette v. United States, 401 U.S. 437, 461-62, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Cantwell v. Connecticut, 310 U.S. 296, 303-04, 60 S.Ct 900, 84 L.Ed. 1213 (1940).
No Louisiana cases address whether a court must honor a criminal defendant’s request that she not be tried on days which she observes her religious Sabbath. However, federal court cases provide persuasive guiding authority on this issue.
Several courts have applied the aforementioned two-factor test in the context of the State’s interest in achieving the efficient and orderly administration of courthouse justice. For example, in Smilow v. United States, 465 F.2d 802 (2d Cir.1972), vacated and remanded on other grounds, 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d-215 (1972), the Second Circuit upheld a contempt judgment based on a witness’s willful refusal to obey a court order to answer questions posed by a grand jury. The recalcitrant witness asserted that his free exercise rights entitled him to refuse to testify since the act of testifying would contravene a Jewish tenet forbidding him from being an “informer.” The Court of Appeals rejected the argument; holding that the witness’s First Amendment claim was outweighed by the compelling state interest in having the grand jury hear all of the relevant evidence pertaining to a *510 crime and the narrowly drawn means that were used to achieve that goal. Id. át 804-05.
|41A similar analysis was employed in Fisher, supra at 1237, when the court considered the request of one of eight co-defendants that trial be adjourned on Fridays so that he could attend, Muslim services. The court noted that while the request was made two weeks prior to the start of the trial, the defendant had not previously requested Fridays off and had been present on four of the previous eleven 'Fridays during which pretrial proceedings took place. Id. Furthermore, the court noted, there were no objections when it had previously announced a five-day-a-week trial schedule. Id. The court denied the defendant’s request because there were a large number of co-defendants and because of the possibility that the case could “last weeks, or perhaps months.” Id. at 1241. Thus, the court found “a legitimate, and compelling judicial interest — one based on both efficiency and fairness to all concerned — in using all available days of the week for trial of this case.” Id. Furthermore, the court found that “there is no less restrictive alternative by which it can serve this interest and at the same time accommodate [the defendant’s] religious beliefs.” Id.
In State v. Pride, 1 S.W.3d 494, 506 (Mo.App. W.D.1999), cert. denied, 529 U.S. 1004, 120 S.Ct. 1269, 146 L.Ed.2d 219 (2000), the court was informed a few months prior to trial that the defendant was a ’ Seventh Day' Adventist. At the beginning of voir dire, the court informed the'jury panel of the possibility that the trial would need to be held on Saturday. Id. The defendant’s counsel reminded the trial judge of the defendant’s religious beliefs, noting that his Sabbath was from sundown Friday to sundown Saturday. Id. The court delayed its ruling until it became clear whether the trial might conclude by sundown on Friday. Id.
By Friday, afternoon, the court suspected the case would not be completed by sundown that day. Id. The trial judge then asked the defendant to take the stand and testify under oath about his religious beliefs. Id. The defendant testified that |42he was a Seventh Day Adventist and that his Sabbath was observed from sundown on Friday until sundown on Saturday and that he could not engage in any secular activities during his Sabbath. Id. He requested that the court not proceed with the trial on Saturday so that he could observe his Sabbath. Id.
The trial judge in Pride denied the defendant’s motion to adjourn the trial until the following Monday. Id. In making his decision, the judge weighed the defendant’s desire not to have trial on Saturday with: (1) the fact that the defendant failed to mention any potential conflict until after the jury had been selected and after the trial judge had already informed the jury of the potential for a Saturday trial; and (2) the fact that the trial judge had a “law day” on Monday, bench trials on Tuesday, and a jury trial on Wednesday of the following week. Id. at 506-507.
On appeal, in Pride, the defendant argued that the court’s refusal to adjourn the trial until the following week presented him with a “Hobson’s choice” in that he could either: (1) exercise his right to observe his Sabbath by staying at home; or (2) appear in court on Saturday to exercise his right to be present at his trial. Id. at 507. Ultimately, he appeared in court on Saturday, against his religious beliefs,’ contending that it was necessary to his defense. Id. ■ Thus, he- argued that the requirement that he violate his beliefs by appearing at trial was constitutional error which entitled him to a new trial. Id.
*511 In finding that the trial court did not abuse its discretion in failing to adjourn court on Saturday, the Pride court found that the trial judge carefully considered the defendant’s concerns and determined nonetheless to hold court on Saturday, because of the defendant’s delay in raising the issue and because it was the only time he could hold court in light of his other scheduled cases. Id. The appellate court noted the trial court could have reached a different conclusion by resetting |43his schedule for the following week, yet concluded that the- failure to do so did not constitute an abuse of the trial court’s discretion.[41] Id.
A number of cases have also denied a defendant’s request for adjournment ■ on the basis of religious observances based on the posture of the trial. For example, in Hoyt. v. Lemn, supra --at 264, the trial court declined to interrupt ongoing jury deliberations until the following Monday so that the defendant, a practicing Muslim, could, “observe his religious holiday and his First Amendment right.” In denying the defendant’s request, the trial court reasoned that a three-day delay would exacerbate the possibility of . a retrial if something were to happen to one of the jurors. Id. The court also noted that the adjournment would cause the court to “lose control” of the jury, and “the State’s interest in getting a verdict surpasses the defendant’s right to be present at his verdict.” Id. The Lewin Court agreed, finding there to be a compelling gQvernment interest in declining to -interrupt jury deliberations, particularly given the approach of a weekend, and further reasoning that the need to continue deliberations “outweighed the very precious and obviously sensitive right of a person to exercise his or her religion.” Id. at 278. See also People v. Johnson, 295 A.D.2d 106, 743 N.Y.S.2d 434 (1st Dept.2002), appeal denied, 98 N.Y.2d 769, 752-N.YS.2d 9, 781 N.E.2d 921 (2002), where the court -upheld the denial of an adjournment request where the defendant did not make the request until Friday morning. The apparently un-sequestered jury was, deliberating, and the court foresaw" problems with postponing continued deliberations to Monday. The court concluded that “a three-day adjournment would have substantially jeopardized the | ^State’s compelling interest in insuring a fair trial for both defendant and the People.” Id. at 107, 743 N.Y.S.2d 434.
In the present case, the record reflects that the trial judge carefully considered defendant’s concerns as well as her delay in' raising this issue, including her failure to object when the prospective jury was advised numerous times of the possibility that they would be required to work on Saturday, her lack of a specific religious affiliation or particular church membership, the unavailability of the State’s key expert witness the following week, and “the justice system as a whole,” in denying defendant’s request not to hold trial on Saturday.
First, the trial court made specific mention of the fact that sixteen jurors had committed to working on Saturday without *512 objection.[42] It was not until Thursday, the third day of voir dire, that defendant first raised this issue. As in Fisher, Pride, and Lewin, supra, although factual differences do exist, a delay in raising the request that court be adjourned on certain days for religious reasons weighed in favor of a legitimate and compelling judicial interest in going forward with trial based on efficiency and fairness.
Moreover, while it has been held improper to inquire into the worthiness of a defendant’s religious beliefs to detérmine whether the First Amendment affords them protection, the court may inquire, as a threshold issue, into the sincerity of the defendant’s religious beliefs. See People v. Johnson, 143 A.D.2d 847, 533 N.Y.S.2d 345 (N.Y.S.2d 1988), where the trial court properly resolved the defendant’s First Amendment claim upon the evidence that the defendant’s observance of the Muslim Sabbath was inconsistent and reflected a lack of sincerity in his belief that Friday is a holy Uday when the defendant stated he was “studying to be a Muslim.” See also Kaplan v. Hess, 694 F.2d 847, 851 (U.S.App.D.C.1982); Fisher, supra at 1240. “Thus the [First] Amendment embraces two concepts, freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.” Cantwell v. Connecticut, 310 U.S. 296, 303-304, 60 S.Ct. 900, 84 L.Ed. 1213; United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148, 1153-54 (1944). In the present case, although the trial court did not specifically find that defendant’s beliefs were insincere, the trial court did take note that when asked what religion defendants followed, Mr. Victor stated that it was “non-denominational,” despite- him being ordained under a Baptist association. He stated that his- religion dated back four thousand years and that the Sabbath was always required to be kept holy as a day of rest.
Indeed, the failure of defendant to object for the first' two days of trial to working on Saturday,[43] and her failure to substantiate her claim by identifying a particular religion, sect, or tradition or a particular church at which she wor-shipped, rendered the particular claim self-serving and did not negate the possibility that it was made in an attempt to obstruct or delay the orderly progress of trial. The record is replete with numerous statements • by defendant, made in pretrial proceedings, that the matter would not go to trial. The record is also replete with other actions by defendant that caused delays in setting the matter for trial, as are noted below.
Lastly, the trial court and the State’s interest in achieving the efficient and orderly administration of courthouse justice was considered. Sixteen jurors were empaneled to hear the Victors’ case regarding a crime that occurred six years earlier in *513 2008, and were met with many obstacles set in place primarily by [^defendant until trial eventually commenced in 2014. Moreover, a large concern, as posed by the State, regarding the adjournment of trial until the following week, was the unavailability of the State’s key out-of-state expert witness.
Accordingly, under the specific facts and circumstances of this case, and considering defendant’s conduct in this case as a whole, we find that the trial judge properly weighed defendant’s right to act pursuant to her religious belief with the State’s compelling interest in the orderly progression of trial and properly found that there was a legitimate compelling judicial interest, based on efficiency and fairness to all, including defendant, in declining to adjourn trial on Saturday. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO

Failure to grant motion for a continuance

In this assignment of error, defendant contends that the failure of the trial court to grant her a continuance so that counsel of her choice could enroll in the case was prejudicial and constituted an abuse of discretion. Specifically, defendant asserts that although she chose to represent herself at trial, she had decided that she wanted the representation of counsel before trial commenced on July 22, 2014. She alleges she was forced to proceed to trial without representation when her motion for a continuance, based upon her new counsel’s need to familiarize himself with the case, was denied. Accordingly, defendant concludes that the trial court abused its discretion by allowing her to proceed to trial pro se when she had an available opportunity to retain a qualified attorney to defend her case.
The State responds that during the life of this case, defendant hired and terminated numerous attorneys. It asserts that defendant’s tactics regarding her representation were dilatory, continually wavering between private representation and self-representation in an attempt to avoid trial. Accordingly, because the trial |47court provided defendant with ample opportunity for representation since the origination of this case, the State maintains the trial court did not abuse its discretion when it denied defendant’s request for a continuance so counsel of her choosing could enroll on the morning of trial,
The procedural timeline provided, infra, sets forth the enrollment and termination of defendant’s attorneys after the quashing of the amended indictment and the grand jury’s re-indictment of defendant for second degree murder on April 12, 2010, the charge for which defendant was tried and then convicted of the responsive verdict of manslaughter. Throughout this case, defendant has gone back and forth numerous times between self-representation and changes of counsel.[44]
*514 April 12, 2010: Defendant indicted on charges of second degree murder..
May 6, 2010: Court orders the appointment of public defender Richard ■ Stricks.[45]
June 15, 2010: Mr. Victor files a pro se motion to enroll attorney" Morris Reed as counsel of record. However, at the July 1, 2010 motion to recuse hearing, Mr. Reed indicated he would be representing both defendant and Mr. Victor.
June 18, 2010: Attorney Morris Reed files motion to enroll' as counsel of record for purposes of a pending Dsdefense motion to recuse, which is granted by the trial court on June 21, 2010.
June 20, 2010: Defendant files a pro se motion to refusé the appointment of the public defender’s office, alleging violations to her Sixth and Fourteenth Amendment rights.
October 14, 2010: Defendant files a pro se motion to terminate the representation of the public defender’s office, al- " leging ineffective assistance of 'counsel and requesting to proceed to trial pro se.
October 18, 2010: Defendant files a pro se “Objection to ‘Pro Se Hearing,”’ alleging that her right to self-representation has been repeatedly violated over the course of several hearings having been held without a “pro se hearing” but rather with the aid of her unwanted public defender.
A hearing is held after which the trial court' determines that defendant is competent to waive her right to counsel, and that she knowingly, intelligently, freely, and voluntarily waived her right, thus, permitting defendant to represent herself-in this . case. The ■trial court further appoints attorney Tomy Acosta with the Public Defender’s Office' to assist defendant as “standby counsel” should defendant require assistance.
November 15, 2010: Motion to enroll filed by attorney James “Jake” Lem-mon, for purpose of a pending bond hearing. Defendant’s motion is granted on the same day by the trial court.
November 17, 2010: Defendant files a pro se motion to relieve the services of Jake Lemmon, as .assistant counsel, requesting that she remain “pro se” in all proceedings.
Defendant files a pro se motion for substitution of assistance of counsel, requesting that she proceed completely on her own. This request is denied by the trial court, and pursuant to a *515 writ taken by defendant to this Court, defendant’s writ application is denied as it related to the trial court’s appointment of the public defender as an advisor and standby counsel.
April 18, 2011: Lionel Bums files a motion on behalf of defendant to serve as counsel of record in this matter, which is granted by the trial court, after a hearing, the same day.
14fl July 8, 2011: Lionel Bums files a motion to withdraw as counsel of record, which is denied by the trial court the same day.
August 8, 2011: Lionel Bums files a second motion to withdraw as counsel of record based on defendant’s termination of his services. This request is denied by the trial judge, and it is noted that counsel and defendant must be prepared to proceed to trial scheduled to commence the following week.[46]
August 16, 2011: Trial set to commence on this date. Attorney Alicia Johnson Butler attempts to enroll as counsel of record on defendant’s behalf. However, the trial court did not rule on the motion to enroll because while out on bond, the Victors failed to appear for trial and were not located until April of 2012 in Georgia. After fighting extradition, the Victors were returned to Louisiana in July of 2012.
December 5, 2012: Minute entry indicates defendant was present in court for -a motion to terminate appointment of counsel Lionel Bums. The court granted Mr. Burns’ motion to withdraw from the case and additionally questioned defendant that if she were to ask 'her the same questions about self-representation would her answers be the same. Defendant stated “yes” and that she did not want the public defender’s office to represent her as standby or assistant counsel.
July 17, 2013: Motion to enroll as counsel of record filed by Stephen A. Yaz- . beck.
January 21, 2014: A scheduling order is established by the court, setting the trial deadlines, including the trial date of July 22, 2014.
Stephen Yazbeck files a motion to withdraw as counsel of record, which is granted by the trial court the same day. Defendant is handed a copy of the “sélf representation colloquy’* that is substantially similar to the one from the October 18, 2010 hearing, and which was filed into the record. Defendant also refuses appointment of the public defender’s office to represent her. Thus, thé trial court determines that after having had “several hearings regarding these defendants andf snmultiple changes of counsel ... defendants . have .substantial . knowledge and understanding of court pro-eeedings. The court will allow defendants to represent themselves at this time with the understanding that should they wish to retain counsel, it must be done in a timely manner, not to. interfere with the trial schedule issued by the court, and the retention of counsel shall not be cause for a continuance of the trial. Counsel will only be permii-ted,to enroll with the understanding *516 that he/she is prepared to comply with all scheduled deadlines, hearings and trial.” (Emphasis added).[47]
On the morning of trial, six months after the trial court set the trial date and defendant’s previous attorney had withdrawn from the case, Tim Yazbeck moved to enroll as counsel of record, predicated on the granting of a trial continuance. This action was taken despite the trial court’s January 21, 2014 admonishment to defendant that the retention of new counsel “shall not be cause for a continuance of the trial.[48] Counsel will only be permitted to enroll with the understanding that he/she is prepared to comply with all scheduled deadlines, hearing and trial.”
The trial judge offered Mr. Yazbeck, instead, the opportunity to serve as standby counsel to the Victors on the condition that the case went on. Mr. Yazbeck declined the court’s offer to assist as standby counsel, stating he would be unprepared to proceed in a standby capacity without a continuance.
In the present case, there is no evidence in the record that a written motion for a continuance was filed or that an oral motion was made seven days in advance of trial, as per La.C.Cr.P. art. 707. Nevertheless, there is a jurisprudential exception to the requirement for a written motion where the circumstances [^producing the motion occur unexpectedly and there is no opportunity to prepare the motion. State v. Bartley, 03-1382 (La. App. 5 Cir. 3/30/04), 871 So.2d 563, 567, writ denied, 04-1055 (La.10/1/04), 883 So.2d 1006 (citing State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 68, writ denied, 98-264 (La.6/19/98), 719 So.2d 481 (holding that the defendant had not preserved the denial of his oral motion for continuance because no unexpected circumstances arose to prevent the filing of the written motion)); see also State v. Shannon, 10-580 (La.App. 5 Cir. 2/15/11), 61 So.3d 706, writ denied, 11-0559 (La.9/30/11), 71 So.3d 283 (where this Court also held that the defendant should have filed a written motion to continue, but nevertheless reviewed the merits of the defendant’s claim).
The record is devoid of any indication as to when Mr. Tim Yazbeck agreed to represent defendant. However, based on the withdrawal of defendant’s last attorney, Stephen Yazbeck, Tim Yazbeck’s father, six months prior to the commencement of trial, it appears unlikely that the circumstances producing defendant’s motion occurred unexpectedly. Nevertheless, the merits of defendant’s claim are addressed. See State v. McGee, 04-963 (La.App. 5 Cir. 1/11/05), 894 So.2d 398, 409-10, writ denied,, 05-0593 (La.5/20/05), 902 So.2d 1050; Bartley, supra; Shannon, 10-580, 61 So.3d at 714.
According to La.C.Cr.P. art. 712, “[a] motion for continuance, if timely filed, *517 may be granted, in the discretion of the court, in any case if there is good- ground therefor.” The Louisiana Supreme Court has consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 447, writ denied, 09-0158 (La.10/16/09), 19 So.3d 473 (citing State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044, 1077, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005)). In addition, the Louisiana Supreme Court generally declines to reverse convictions even on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice. Id. at 2 So.3d at 447. This Court has also recognized that the denial of a motion for a continuance is not grounds for reversal absent abuse of discretion and a showing of specific prejudice. Davenport, supra (citing State v. Bartley, 871 So.2d at 567).
Moreover, while a person accused in a criminal trial generally has the right to counsel of his choice," a defendant must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner, and at an appropriate stage of the proceedings. State v. Reeves, 06-2419 (La.5/5/09), 11 So.3d 1031, 1057, cert. denied, 558 U.S. 1031, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009); State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003): There is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications to the orderly trial of cases. State v. Leggett, 363 So.2d 434, 436 (La.1978).
It is further well established that a defendant in a criminal trial cannot, by a last minute change of counsel, force a postponement. State v. Williams, 00-1850 (La.App. 5 Cir. 4/11/01), 786 So.2d 785, 790-91, writ denied, 01-1432 (La.4/12/02), 812 So.2d 666. In State v. Divine, 98-8.12 (La.App. 5 Cir. 5/19/99), 738 So.2d 614, 616-17, writ denied, 99-2393 (La.2/4/00), 754 So.2d 222, cert. denied, 530 U.S. 1219, 120 S.Ct. 2227, 147 L.Ed.2d 258 (2000), defense counsel orally moved for a continuance on the day of trial, saying that the defendant had told him he had hired another lawyer to represent him. The trial court denied the motion, stating that there was a two-month period from the date of arraignment to trial for 153the defendant to retain new counsel or handle any other matters he felt appropriate. Id. at 3, 738 So.2d at 616. This Court could not say the trial court erred in denying the motion. Id. at 5, at 738 So.2d at 617.
Here, defendant was initially indicted in 2008, with the last indictment occurring in April of 2010. The record indicates that as of April 2010, defendant changed, or attempted to, change, counsel nine times.[49] Moreover, in January of 2014, the trial court set forth very specific pretrial deadlines, including a July 22, 2014 trial date with the admonition that defendant could retain new counsel, however, cautioning defendant that the retention of new counsel would not be cause for a continuance of the trial. Defendant had over four years from the date of the last indictment to select representation, and over six months from the court’s admonishment.
*518 The grant or denial of a motion to continue and a motion to enroll as counsel is within the well-founded discretion of the trial court. Davenport, supra; State v. Ventris, 10-889 (La.App. 5 Cir. 11/15/11), 79 So.3d 1108, writs denied, 13-1532 (La.4/17/14), 138 So.3d 616 and 14-2237 (La.4/24/15), 169 So.3d 355. Accordingly, we find no abuse of the trial court’s discretion in denying defendant’s motion to enroll predicated on a motion to continue the trial, especially when the 'proposed new counsel was the ninth change, or attempted change, of counsel made by defendant, and at a time when the trial date had been set six months in advance with defendant’s knowledge that another continuance would not be granted. Considering these facts, defendant failed to show she was attempting to exercise her right to choose an attorney at a reasonable time, in a reasonable manner, and at an appropriate stage of the proceedings. See State v. Burbank, 07-125 (La.App. 5 Cir. 10/30/07), 971 So.2d 1173, 1178, writ denied, 07-2287 (La.4/25/08), 978 So.2d 364.
Further, the record here does not support defendant’s contention in her appellate brief that she was forced to proceed to trial without counsel, or that she was not prepared to proceed pro se for trial. To the contrary, the record indicates that throughout the life of this case, defendant adamantly voiced her desire to represent herself at all stages despite express warnings by the trial court regarding self-representation. The above-mentioned time-line illustrates this fact by showing the self-representation colloquies conducted by the trial court and the numerous terminations'of counsel, stand-by counsel, and court-appointed public defenders by defendant. At the hearing on' October 18, 2010, defendant expressly stated that both previously retained and appointed counsel, had not abided by her and Mr. Victor’s wishes, allegedly encouraging them to conduct contradictory defenses, and that they were adamant that they-wished to maintain control of their own trial strategy. Defendant reiterated that position throughout the case.' Accordingly, 'the trial court did not abuse its discretion in denying defendant’s motion to enroll Mr.- Yazbéck as counsel on the date of trial predicated on a continuance of the trial. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE

Improper allotment of defendant's case

In this assignment of error, defendant argues the allotment of her case to Division “B” of the 40th Judicial District Court following her 2010 indictment was a violation of her right to' due process and equal protection when her original 2008 proceeding was first allotted to Division “A” of said court. She alleges that the allotment method employed by the State was also contrary to the local rules of the 40th Judicial District Court. She contends that her newly indicted 2010 case | ^should have remained in Division “A” to protect her from the State’s ability to “judge shop.” Defendant claims the irrevocable- harm and/or prejudice caused by the erroneous allotment procedure changed the course of the prosecution for defendant’s entire case. Defendant alleges that the 2010 indictment would have “never survived in front of Judge Madeline Jasmine in section ‘A,’” because she knew and understood the case “like no other judge in the parish.” Thus, defendant implies that the State violated her equal, .protection and due process rights by purposefully having.the ease assigned a new number .so it could be allotted to a different judge.
The State responds that the allotment of defendant’s case was proper because it was assigned according to the applicable rules *519 of court, and thus, the trial court’s denial regarding the transfer of defendant’s 2010 case to Division “A” was proper.
As previously noted, supra, on April 15, 2008, defendant was charged by indictment with accessory after the fact to first degree murder and cruelty to a juvenile. Defendant’s case was randomly allotted to Division “A” under case number 2008-CR-165 of the - 40th Judicial District Court, Judge Madeline Jasmine presiding. On September 22, 2009, both defendant and Mr. Victor’s charges were amended by indictment to second degree murder, while engaged in the perpetration of the crime of cruelty to a juvenile, in violation of La. R.S. 14:30.1(A)(2)(b). Defendant subsequently filed a motion to qua!sh the indictment, which was granted by Judge Jasmine on February 4, 2010: Though originally filing a motion for reconsideration and alternatively a notice of appeal, the State filed a notice of dismissal without prejudice of all pending charges on April 6, 2010.
Six days later, on April 12, 2010, a newly empaneled grand jury re-indicted defendant and Mr. Victor with second degree murder while engaged in the perpetration of the crime of cruelty to a juvenile, in violation of La. R.S. 14:30.1(A)(2)(b). The case was randomly allotted to Division “B,” case number 2010-CR-172 of the 40th Judicial District Court, Judge Mary Hotard Becnel presiding. Defendant filed an “Objection to ‘Allotment’ of Case to Division ‘B’ and Motion for Transfer to Division of Original Allotment Division A,’ ” on May 17, 2010.[50] The motion to transfer to the originally allotted division was heard on August 4, 2010, and denied with written reasons on August 18, 2010.[51]
After taking the matter under advisement, the court issued written reasons for its judgment denying defendant’s motion to transfer. ' In its reasons, the trial court found that at the time the grand jury returned the April 12, 2010 indictment, there were no felony cases pending against defendant. Thus, the court found it was proper to treat the 2010 indictment as a new case by assigning it a new case number and . allotting the case, randomly. The trial court further noted that the random allotment, procedure employed by the Clerk of Court was not: contrary to the local rule in Appendix 14.0A of the 40th Judicial District Court, because the local rule was- removed pursuant to an en banc order after which it was determined that the local rule (which provided for the division of subclasses of felonies) had no reasonable basis, was too onerous for the clerk’s office, and had never been actually followed.
Additionally, the judge noted that, unlike some district courts that have a local rule in place regarding the allotment of subsequent indictments arising out of the same'transaction or occurrence to the division • of original allotment, the 40th | ¡^Judicial District Court has no such local rule. Finding no harm to defendant due to lack of such a local rule, the trial court *520 considered this matter case-specific in disagreeing with defendant’s argument that a lack of such a rule promoted judge-shopping.
Thereafter, defendant’s counsel filed a timely writ application with this Court challenging the trial court’s ruling. .This Court granted review, but denied relief on February 4, 2011,. finding “[t]he allotment of the present matter violated neither the applicable Rules of Court nor due process. Accordingly, on the showing made, the writ is denied.”
The arguments presented by defendant herein appear to be essentially the same as those made in her prior writ application. Under the discretionary principle of “law of the case,” an appellate court will generally refuse to reconsider its ovm rulings of law on a subsequent' appeal in the same case. State v. Burciaga, 05-357 (La.App. 5 Cir. 2/27/06), 924 So.2d 1125, 1128; State v. Junior, 542 So.2d 23, 27 (La.App. 5 Cir.1989), writ denied, 546 So.2d 1212 (La.1989). The principle is applicable to all decisions of an appellate court, not solely those arising from full appeal. State v. Johnson, 06-859 (La.App. 5 Cir. 4/11/07), 957 So.2d 833, 840. One reason for imposition of the doctrine is the avoidance of indefinite re-litigation of the same issue, but it will not be applied in cases of palpable formér error. Id. Reconsideration is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Davis, 03-488 (La.App. 5 Cir. 11/12/03), 861 So.2d 638, 641 n. 2, writ denied, 03-3401 (La.4/2/04), 869 So.2d 874; In re K.R.W., Jr., 03-1371 (La.App. 5 Cir. 5/26/04), 875 So.2d 903, 905.
Here, defendant has failed to cite to any new facts adduced at trial or additional jurisprudence tending to indicate that this Court’s prior disposition was [^patently erroneous and produced an unjust result. However, since prior denial of supervisory writs does not preclude reconsideration of the issue on appeal, the merits of defendant’s assignment will be addressed. See State v. Castleberry, 98-1388 (La.4/13/99), 758 So.2d 749, 755, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); State v. Cowart, 01-1178 (La.App. 5 Cir. 3/26/02), 815 So.2d 275, 290, writ denied, 02-1457 (La.5/9/03), 843 So.2d 387.
In this assignment, defendant contends that when the grand jury re-indicted her on April 12, 2010, the case should have gone to Judge Jasmine’s division rather than being randomly re-alloted to Judge Becnel’s division.
Uniform District Courts Rule 14.1 provides:
(a) Unless a different method is set forth in Appendix 14.1, if a defendant has a felony case pending and previously allotted, any new felony arrest for that defendant shall be allotted to the division to which the pending felony was allotted. This “felonies-following-felonies” rule also applies to any pending felony arrests for a codefendant with a new arrest and billed as a co-defendant. ■
(b) For purposes of this Rule, a felony case remains pending until any of the following events has occurred:
(1) a bill of information or indictment is filed or amended, reducing the case to a misdemeanor;
(2) the District Attorney’s Office enters a nolle prosequi in a case; or
(3) there is an adjudication of guilty by plea or trial.
(Emphasis added.)
In its reasons for judgment, the trial court noted that
*521 [according to Rule 14.1, the case against the defendants ... assigned to [Judge Jasmine’s division] was terminated upon the notice of dismissal filed by the [S]tate on April 6, 2010, following the granting of the motion to quash.[52] Therefore, at the time of the indictment returned by the grand jury on April 12, 2010, there were no felony cases pending ■against the defendants. As such, the court finds it was proper to treat the third indictment against the defendants as a new case by assigning it a new case number and allotting the case by random allotment.
IssThe trial court properly agreed that Rule 14.1 only applies when a defendant has a felony case pending and previously allotted. Felony cases cease to be considered pending when the “District Attorney’s Office enters a nolle prosequi in a case.” See Uniform District Court Rule 14.1. Here, the State filed a nolle prose-qui on April 6, 2010, six days before defendant was re-indicted by a newly empaneled grand jury. Thus, Rule 14.1(a) does not apply.
Defendant avers that the system of allotment employed promotes “judge shopping” by the State and that defendant’s case would have remained in Judge Jasmine’s division after re-indictment under the local rules of other Louisiana judicial districts. Defendant cites State v. Simpson, 551 So.2d 1303, 1304 (La.1989), the seminal Louisiana case dealing with random allotment, in support of his theory.
In Simpson, the allotment process was one in which, according to the stipulation of the parties, “the judges [were] chosen by the district attorney’s office.” The Louisiana Supreme Court pertinently held that “[t]o meet due process requirements, capital and other felony cases must be allotted for trial to the various divisions of the court, or to judges assigned criminal court duty, on a random or rotating basis or under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned.” (Footnotes omitted.) Id.
Also, in State v. Rideau, 01-3146 (La.11/29/01), 802 So.2d 1280, another case cited by defendant, the Supreme Court determined that a procedure for randomly allotting capital cases on a rotating basis until all divisions of the court had been assigned a capital case did not satisfy Simpson because the district attorney still retained a direct role, albeit a diminished one, in the allotment procedure.
| ,¾⅛ this case, defendant is essentially complaining that her due process rights were violated because, in the 40th Judicial District, the State “was able to assign the case a new number to automatically move the case into the judge of choice by the rule of allotment.” However, in this case, there was no violation of the Simpson rule because defendant has failed to show that the prosecutor had the power to influence the allotment of defendant’s case.
And while defendant appears correct in her assertion that some judicial districts have a rule whereby her case would have been re-assigned to Division “A” after the filing of a new indictment, defendant cites to no law or jurisprudence (nor has any jurisprudence been located) indicating that because a majority of Louisiana judicial districts adhere to a rule, the 40th Judicial District must follow the same rule.[53]
Defendant also asserts that the allotment of her case was “contrary to the local *522 rules of the 40th JDC.” To the extent that defendant is arguing the allotment of her case violated the 40th Judicial District Court’s former local rule addressing the system of random allotmént of felony cases by subclass, defendant’s argument must fail.
The 40th Judicial District Court’s former local rule required the Clerk of Court to subdivide felonies into various, classes before randomly allotting the cases to thé various divisions of court. While defendant’s case was never subdivided prior to random allotment, as Judge Becnel noted in her reasons for judgment, pursuant to ah en banc order, on August 1, 2010, the judges of the 40th Judicial District Court agreed to remove the requirement in Appendix 14.0A of the localj^rule that cases be subdivided into classes because" “such a system of allotment had no reasonable basis and was too onerous on the clerk’s office.” According to the trial court, the local rule had never been followed. The trial court concluded that there was no prejudice to defendant and “to now reallot this case (arid others) according to a rule that has never been followed and is no longer in effect would be extremely burdensome to the court and actually promote the ‘judge-shopping’ of which defendants complain.”
Also, the allotment procedure employed here was not done by numerical rotation, which would invite the manipulation of allotments.[54] Appendix 14.0A to District Rule 14.0 clearly states that cases are to be grouped into subclasses and then randomly allotted to judges of the 40th Judicial District Court. ‘ Under the 40th Judicial ■ District Court’s former local rule, there is no requirement that a judge could not be assigned another subclass'of a case until every judge in the judicial district has been assigned such a case, which would appear to violate due process by encouraging manipulation of allotments. In the present case, defendant has not shown that the district attorney could have known which judge defendant’s case would be assigned to because her case was randomly allotted.
Thus, the allotment in this case complied with the' Simpson rule that felony cases must be randomly allotted “or [allotted] under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a pax-ticular case is assigned.” Simpson, supra. Accordingly, this assignment of error is without merit.
I ^ASSIGNMENT OF ERROR NUMBER FOUR

Violation of La.C.Cr.P. art. 673 after motion for recusal filed

In this assignment of errolr, defendant argues that the judges of the 40th Judicial District Court engaged in a “scheme to *523 illegally subject [her] to a trial without in personam jurisdiction over [her].” She avers that she submitted prima facie proof of the judges’ inherent bias and established that they were “collectively embroiled in an ongoing conspiracy to deprive [her] of protections, substantive and inalienable rights due [her] by the U.S. Constitution,” Defendant asserts that based on these issues, she filed. a motion to recuse the judges of the 40th Judicial District Court, but that despite the filing of said motion, which she claims should have immediately stopped any proceedings in the case, the judges continued to act in violation of La. C.Cr.P. art. 673. Accordingly, defendant maintains that it was error for the judges to have acted on her case before final consideration of her motion to recuse w’as heard. She. maintains- that this alleged error renders the judicial actions taken in this case null and void.
Here, defendant does not allege that her motion to recuse the judges of the 40th Judicial District Court was erroneously denied; rather, defendant contends that the trial court improperly took actions in her case despite her pending recusal motion in violation, of La.C.Cr.P. art. 673. Defendant also argues, in her reply brief, that the State’s assertion that her motion to recuse was filed on May 12, 2010, is erroneous, as she contends it was filed on March 29, 2010, thus proving another instance in which she was denied substantive due process.
La.C.Cr.P. art. 673 provides:
A judge has full power and authority to act, even though a ground for recusation exists, until he is recused, or á motion for his recusation is filed. The judge to whom the motion to recuse is assigned shall have full power and authority to act in the cause pending the disposition of the motion to recuse.
| ^Defendant contends in her reply brief that she filed the motion to recuse on March 29, 2010. The record shows a motion to- recuse filed on May 12, 2010 was signed by defendant on March 29, 2010. However, it must be remembered that Judge Jasmine had granted the motion to quash on February 4, 2010. Though the State did not file its motion to dismiss until April 6, 2010, the trial court noted in its ruling denying the objection to allotment that grant of the State’s motion to dismiss was “superfluous” once the motion to quash had been granted ending the prosecution. Thus,' at the alleged filing date of March 29,' 2010, the judgment granting the motion to quash had ended the case.
Defendant was again indicted on April 12, 2010; On May 12, 2010, defendant’s “Motion for Recusal for all Judges that Sits En Banc in the Fortieth Judicial District Court for the Parish of the [sic] St. John the Baptist in Both Civil and Criminal Matters, and Motion to have Louisiana Supreme Court Appoint Special Judge to Hear All Pending Trials” signed by defendant oh March 29, 2010 was-filed into the record of this proceeding. On May 13, 2010⅛ an en banc order was issued by the three judges of the 40th Judicial District Court ordering that “Jüdges Madeline Jasmine, Mary Hotard Becnel and J.' Sterling Snowdy be and are hereby recused from hearing the recusal in these matters.” The order further stated that “all proceedings are stayed pending the hearing on the recusal” and requested that the Louisiana Supreme Court appoint a judge ad hoc to hear and preside over the recusal matter.
On May 21, 2010, defendant filed a “Motion to Immediately have Hearings or Ex-Parte Order to Reinstate Existing Borids ... or an Order of Habeas Corpus ... and to Stay any Order for Recusal hearing of All Judges Prior to Said Above Reinstatement of Bonds....” Oh May 24, 2010, Judge Becnel issued an order acknowledging the receipt of defendant’s Writ of Habeas Corpus, but reminded | ^defendant *524 that per the May 14, 2010 en banc Order, all proceedings had been stayed pending the recusal hearing.[55] On May 25, 2010, the Louisiana Supreme Court assigned retired Judge Frank Foil as judge ad hoc of the 40th Judicial District Court to pi'eside over defendant’s recusal motion. On June 21, 2010, Judge Foil granted attorney Morris Reed’s motion to enroll as counsel of record for defendant for purposes of the motion to recuse hearing.[56] On July 1, 2010, a hearing was held on defendant’s motion to recuse. At the conclusion of the hearing, ad hoc Judge Foil denied defendant’s motion.
Defendant’s allegation that actions were taken on her case while her motion to recuse was pending is not supported by the record. Defendant does not set forth the alleged “acts” that were performed by the trial court while the motion was pending, and after a careful review of the record, no such acts can be found. In fact, all proceedings were explicitly stayed per the May 14, 2010 en banc order, contrary to defendant’s allegations that the judges of the 40th Judicial District Court acted in the case while the motion to recuse was pending. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER SIX

Denial of defendant’s expert witness testimony

In this assignment of error, defendant argues that she was denied her right to present a defense when the trial court precluded her proposed defense expert witness, Dr. Velva Boles, from testifying regarding the cause of M.L.’s death. She contends that Dr. Boles’ testimony could have assisted the defense in the cross--examination of the State’s expert pathologist, provided alternative explanations for the “physical findings” in this case, and aided in determining whether there was sufficient evidence to raise the “parental-discipline defense.” She maintains that the State never conclusively established an undisputed cause of death, and that the preclusion of critical medical testimony of Dr. Boles, which she claims would have refuted the State’s evidence, severely crippled her defense. She notes that Dr. Boles was previously admitted as an expert witness by Judge Jasmine in a pretrial bond hearing conducted under the original indictment brought against her. Defendant avers that despite Dr. Boles’ roster of qualifications in areas directly related to the medical issues at stake in this case, she was erroneously rejected as an expert witness who could have provided testimonial evidence regarding defendant’s innocence. Defendant concludes that the trial court deprived her of her Fourteenth Amendment right to equal protection when it denied her the opportunity to utilize Dr. Boles as her expert witness on the grounds that she was not board certified as a forensic pathologist when other physicians lacking in such qualifications have *525 been permitted to .testify as expert witnesses.
The State responds that the trial court properly ruled that Dr. Boles could not testify as an expert witness in this case based upon the fact that her medical license had been revoked by the State of Louisiana on grounds of unprofessional conduct, having misrepresented herself on numerous occasions before courts of law regarding her credentials.
Louisiana. Code of Evidence art. 702, which controls the admissibility of expert testimony, provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert.by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
| asín reviewing the decision of a trial court in qualifying a witness as an expert, courts typically place the burden on the party offering the witness as an expert. State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, 870, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997). The Louisiana Supreme Court has consistently held that the competency of an expert witness is a question of fact to be determined within the sound discretion of the trial judge. The trial court’s rulings on the qualifications of expert witnesses will not be disturbed absent an abuse of discretion. State v. Trahan, 576 So.2d 1 (La.1990); State v. Lewis, 353 So.2d 703 (La.1977); State v. Gray, 351 So.2d 448 (La.1977); State v. Madison, 345 So.2d 485 (La.1977); State v. Marks, 337 So.2d 1177 (La.1976).
A trial court acts as a gatekeeper to the admissibility of expert testimony. State v. Foret, 628 So.2d 1116, 1121 (La. 1993). “The objective of that [gatekeep-ing] requirement is to ensure the reliability and relevancy of expert.testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999);
Generally, the test óf comper tency of an expert is the expert’s knowledge of the subject about which he is called upon to express an opinion. State v. Ferguson, 09-1422 (La.App. 4 Cir. 12/15/10), 54 So.3d 152, 166, writ denied, 11-0135 (La.6/3/11), 63.So.3d 1008. A combination of specialized training, work experience, and practical application of the expert’s knowledge can combine to establish that person as an expert. Id. Courts can also consider whether a witness has previously been qualified as an expert. Craig, supra. Importantly, the refusal of a trial court | fiBto receive expert testimony “will rarely, if ever, provide grounds for reversal.” Id.; See State v. Stucke, 419 So.2d 939, 944 (La.1982).
In the instant case, we find no abuse of discretion in the trial court’s ruling that defendant’s proposed expert, Dr. Boles, was not qualified to provide expert testimony in the field of forensic pathology-
Pursuant to defendant’s questioning, Dr. Boles testified regarding her education, experience, and alleged qualifications as a proposed expert witness in the field of forensic pathology. Dr. Boles was specifically questioned about her pathology experience. She explained that during her medical studies, she received training in classical and anatomical pathology at the University of Pittsburgh through her en *526 rollment in the Department of Pathology. Dr. Boles testified that pursuant to her forensic medicine training, she received a level five Certified Medical Investigator certification.[57]
Dr. Boles testified that she had observed autopsies performed by physicians in the field of forensic pathology and had worked with “groups to review autopsies, to review medical records, and provide a written report with respect to any processes that were performed” at the request of attorneys. Dr. Boles testified that she received continuing medical education hours, was currently employed as an independent physician, and was not on staff with any medical facility.[58] When questioned as to whether she had testified or been involved as an expert in the investigation of a first degree murder trial, Dr. Boles testified that she and “several persons” “conferred” with the prosecution on matters presented in a first degree murder trial in Las Vegas, Nevada,- She concluded that she believed her ^credentials qualify her as an expert in the fields of forensic pathology and medical investigation.
During the State’s traversal, Dr. Boles was confronted with documentation concerning the revocation of her medical 'license. Despite being confronted with documentation from the Louisiana State Board of Medical Examiners, Dr. Boles denied any knowledge that her license to practice medicine in Louisiana had been revoked. She further denied the State’s allegation that she had been precluded from testifying as an expert in the case of Hamilton v. Negi, in the United States District Court for the Western District of Louisiana, on the grounds that she had been untruthful about her credentials concerning her alleged Ph.D. in pathology.[59] *527 Dr. Boles also stated that she had no knowledge of ever being sued for malpractice, and that no disciplinary action- had ever been taken against her by the Louisiana Board of Medical Examiners because she falsely represented that she had completed a residency at Tulane University in pediatrics.
The State then introduced documentation from the Louisiana Board of Medical Examiners (the “Board”) confirming that on April 20, 2009, a complaint | fiRwas investigated by the Board regarding Dr. Boles’ untruthfulness in her application for medical staff privileges at Ohristus St. Frances Cabrini Hospital in Alexandria, Louisiana. The Board’s investigation disclosed that Dr. Boles had omitted or provided different years for her date of birth in communications with the hospital, in her application for licensure with the Board, on her application to take the “USMLE,” on her driver’s license, and on her medical school records. The -investigation further disclosed that Dr. Boles attempted to apply for privileges requiring successful completion of a residency program in Internal Medicine when she had not completed such a program. Dr. Boles further reported that she possessed a specialty in Internal Medicine and Pediatrics having completed a residency program at Tulane University Medical School in New Orleans, Louisiana; however it was discovered that she left the program in 1998 prior to completion.
The Board’s investigation confirmed that the filing of a formal administrative complaint was warranted on charges that Dr. Boles exhibited unprofessional conduct in violation of La. R.S. 37:1285(A)(13). A formal complaint was thus filed. One of the bases for the complaint was the finding by the District Court of the Western District of Louisiana, which excluded the proposed expert testimony of pr. Boles in the case of Hamilton v. Negi case number 09-CV-0860.[60] The Board reported that the district court found Dr. Boles had “testified under oath in two other matters that she held a Ph.D. in pathology, although she testified that she did not have that degree in the Hamilton case. The court further found [Dr. Boles] had misrepresented her experience as an expert witness.” The Board noted that in the Hamilton case, Dr. Boles denied under oath that she had ever been sued for malpractice, when it appeared that she had | ^knowledge that she had been a named defendant in a lawsuit. She further testified that she had beéñ accepted as an expert witness in a case in the Eastern District of Louisiana, when in fact she had not. When reviewing the Hamilton case, it was further discovered that Dr. Boles did not reveal that she had, at one time, been Mr. Hamilton’s treating physician. The Board found Dr. Boles guilty of unprofessional conduct, noting Dr; Boles’ transgressions to be “particularly egregious.” Thus, the Board issued an opinion that Dr. Boles “shall not serve as a medical expert or consultant for the purposes of litigation for the remainder óf her medical career.’ (Emphasis add *528 ed.) The Board revoked her medical license on April 14, 2014 based on her unprofessional conduct.
At the conclusion of Dr. Boles’ testimony regarding her qualifications, defendant offered Dr. Boles as an expert in the field of forensic medicine. The trial- court denied defendant’s request, finding Dr. Boles was not qualified to testify as an expert in the field of forensic pathology or forensic medicine.
Defendant then proffered the testimony Dr. Boles gave at the preliminary hearing held on May 29, 2008 before Judge Jasmine under the original indictment filed against defendant. The transcript from the preliminary hearing indicates that Dr. Boles testified regarding her qualifications as an expert witness in the field of pathology. Dr. Boles untruthfully stated that she possessed a Ph.D. in classical pathology and was board certified as a medical investigator. She was ultimately accepted, for the first time, as an expert in those fields by Judge Jasmine. The revocation of Dr. Boles’ medical license had not yet occurred at that time.
The qualification of an expert witness rests within the sound discretion of the trial judge. Trahan, supra. The overwhelming evidence presented to. the trial court regarding Dr. Boles’ credentials established her untruthfulness regarding the field of expertise in which defendant sought to have her qualified as an expert. ItJjwas established that the Louisiana Board of Medical Examiners had revoked Dr. Boles’ medical license for dishonesty based upon false testimony regarding her credentials in previous cases, as well as in documentation submitted for employment purposes. In revoking her license, the Board explicitly ordered that Dr. Boles not testify before any court in Louisiana as an expert witness. Accordingly, we find that the trial judge did not abuse her discretion in refusing to allow Dr. Boles to testify as an expert in the present case. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER SEVEN

Violation of right to a speedy trial

In this assignment of error, defendant argues that the State failed to timely institute prosecution and commencement of trial, in violation of her statutory and constitutional right to a speedy trial. Defendant argues that she was denied access to the court for over five months after she declared her intent to represent herself. She argues that for the first five months after being arrested on May 4, 2010 on the third indictment, the court ignored and failed to address all of her pleadings. In particular, defendant argues that she was not arraigned on the third indictment for over 120 days, and that the trial court’s failure to hold a Faretta[61] hearing in this time period denied defendant a speedy trial.
The State in turn argues that defendant’s speedy trial rights were not violated when the length of the delay was minimal, defendant was the direct cause of the delays, based on the numerous repetitive and frivolous pre-trial motions filed, and defendant failed to appear for her first scheduled trial after fleeing the State of Louisiana for nine months. The State contends defendant employed these actions as dilatory tactics to avoid trial.
[yiThere are two separate and distinct bases for a defendant’s right to a speedy trial: a statutory right granted by La.C.Cr.P. art. 701, and a constitutional right embodied in the Sixth Amendment to *529 the United States Constitution and Article I, § 16 of the Louisiana Constitution of 1974. The two are not equivalent. State v. Cowger, 581 So.2d 283, 285 (La.App. 5th Cir.1991); State v. Sosa, 446 So.2d 429, 432 (La.App. 4th Cir.1984), writ denied, 450 So.2d 361 (La.1984), cert. denied, 469 U.S. 866, 105 S.Ct. 209, 83 L.Ed.2d 140 (1984).
A statutory speedy trial claim is a pre-trial claim that becomes moot upon conviction. See State v. Johnson, 622 So.2d 845 (La.App. 4th Cir.1993). Any rights under La.C.Cr.P art. 701 become moot after conviction because the remedy for such a violation is the pre-trial release of the defendant, not a bar to prosecution. State v. Johnson, 08-1156 (La.App. 5 Cir. 4/28/09), 9 So.3d 1084, 1091, writ denied, 09-1394 (La.2/26/10), 28 So.3d 268 (citing State v. Cowger, 581 So.2d at 286).
The constitutional right to a speedy trial attaches when an individual becomes an accused, either by formal indictment or bill of information, or by arrest and actual restraint. State v. Pleasant, 489 So.2d 1005, 1010 (La.App. 1st Cir.1986), writ denied, 493 So.2d 1218 (La. 1986). Claims for speedy trial violations are evaluated under the four-factor test set forth in Barker v. Wingo, 407 U.S. 514, 530-531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). The, considerations in determining whether a defendant has been deprived of a speedy trial are: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant’s assertion of his rights; and (4) the actual prejudice to the defendant. The initial inquiry is into the length of the delay. If the delay is presumptively prejudicial, there will be an inquiry into the other factors. Id. The peculiar circumstances of the case will determine the weight to be ascribed to the length of the delay and the reason for the |72delay. Cowger, supra at 286; State v. Reaves, 376 So.2d 136, 138 (La.1979); see also Doggett v. United States, 605 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). A delay that is acceptable in one case may not be acceptable in another because the complexity of the case must be considered. Gray v. King, 724 F.2d 1199, 1202 (5th Cir.1984), cert. denied, 469 U.S. 980, 105 act. 381, 83 L.Ed.2d 316 (1984) (citing Barker, 407 U.S. at 531, 92 S.Ct. 2182). The manner of proof must also be considered, as must the gravity of the alleged crime. Id.
There is no time limitation upon the institution of prosecution for any crime for which punishment may be life imprisonment. La.C.Cr.P. art. 571. Defendant in this matter was charged with second degree murder, the penalty for which is life imprisonment. La. R.S. 14:30.1. Also, where a criminal prosecution has been timely instituted and then dismissed, a new prosecution for the same or lesser offense based on the same facts may be instituted within the time established in Title XVII, Chapter 1 of the Louisiana Code of Criminal Procedure, or within six months of the date of dismissal, whichever is longer. La.C.Cr.P. art. 576.
Defendant was originally indicted on charges of accessory after the fact to first degree murder and cruelty to a juvenile on April 15, 2008. On September 22, 2009, a grand jury issued an amended indictment charging defendant with second degree murder. On February 4, 2010, the trial court granted defendant’s motion to quash the amended indictment.
After dismissing the charges, on April 12, 2010, a newly empaneled grand jury returned an indictment charging defendant with second degree murder in perpetration of cruelty to a juvenile. It is under this indictment that defendant was prosecuted and convicted of the responsive verdict of manslaughter. Both the 178original indict *530 ment and the current indictment[62] were brought timely, according , to La.C.Cr.P. arts. 571-572. Thus, the State complied with the time limitations for institution of prosecution in this matter.
With respect to the issue as to whether the State timely commenced trial, La.C.Cr.P. art. 578 provides that no trial shall be commenced in felony cases after two years from' the date of institution of prosecution. The Louisiana Supreme Court has explained that the “statutory periods of limitation ‘enforce the accused’s right .to a speedy trial and ... prevent the oppression caused by suspending, criminal prosecutions, over citizens for indefinite periods of time.’” State v. Romar, 07-2140 (La.7/1/08), 985 So.2d 722, 725. The date of institution of prosecution is the date when the indictment is returned or the bill of information is filed. State v. Smith, 07-959 (La.App. 5 Cir. 3/11/08), 982 So.2d 831, 834; see also La.C.Cr.P. art. 934(7).
Once a defendant shows that the State has failed to commence trial within the time periods specified by the general rule governing time limitations for commencement of trial, the State bears a heavy burden to demonstrate that either an interruption or a suspension of the. time limit tolled prescription. State v. Morris, 99-3235 (La.2/18/00), 755 So.2d 205.
For purposes of the instant analysis, the period of limitation established by Article 578 shall be interrupted if “[t]he defendant at any time, with the purpose to avoid detection, apprehension, or prosecution, flees from the state.... ” La. C.Cr.P. art. 579(A)(1). The two-year limitation established by Article 578 shall commence to run anew from the date the cause of the interruption no longer exists. La.C.CrJP. art. 579(B). Moreover, the time limitation for the commencement of trial is suspended when a defendant files a motion to quash or other “preliminary 174pleas.” La.C.Cr.P. art. 580. A “preliminary plea” under Article 580 is any pleading or motion filed by the defense which has the effect of delaying trial. State v. Brooks, 02-792 (La.2/14/03), 838 So.2d 778, 782. When a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but, in no case shall the State have less than one year after the ruling to commence trial. Id.
Defendant was indicted for second degree murder in perpetration of cruelty to a juvenile on April 12, 2010. Thus, barring interruption under La.C.Cr.P. art. 579 or suspension under La. C.Cr.P. art. 580 of the time delay, the State had until April 12,2012 to commence trial.
The record reveals that arraignment was set' for May 3, 2010; however, the minute entry shows that defendant did not appear. A minute entry from May 6, 2010 shows that arraignment was again set for May 17, 2010. It appears that defendant was not arraigned on the third indictment until August 16, 2010, at which time she refused to enter a plea, with the trial court entering a plea of not guilty for her. Defendant fails to show, however, how the delay in arraignment prejudiced her or affected her speedy trial rights.
Within that time span, the record shows that defendant filed multiple motions, including a Motion to Recuse the entire 40th Judicial District Court on May 12, 2010, as noted previously in this opinion. All mat *531 ters in this case were stayed pending the hearing on that motion, which occurred on July 1, 2010. Accordingly, defendant’s assertion that she was prevented access to the court during this time period is unsupported by the record, as defendant was’in fact able to file many pleadings during this time period, though all rulings were necessarily stayed until her motion to recuse could be heard and decided. After the recusal 17fimotion was disposed of, .the record shows that motion practice continued, with defendant filing a notice of intent to take writs on at least one trial court ruling, as well as a defense motion to continue filed on September 16, 2010, which was granted.
On October 18, 2010, approximately five months, after defendant’s arrest on the third indictment, and after the motion practice noted above, the trial court held an extensive hearing regarding defendants’ desire to represent .themselves and to refuse retained or appointed counsel, In a thorough hearing on the matter, defendant and Mr. Victor unequivocally expressed their dissatisfaction with both. prior retained and appointed counsel, stating that they wished to maintain control of their own trial strategy, which prior counsel had not afforded them. At the conclusion of this hearing, defendant and Mr. Victor were granted the right to represent themselves, with the court noting that, they retained the right to hire counsel in the future if they wished. Defendant has failed to show, however, how the timing of this hearing caused her prejudice, and makes only eonclusory allegations that substantial rights were affected. The record shows, contrary to defendant’s assertions, extensive motion practice by defendant that belies defendant’s assertion that her access to the court was restricted for a five-month period, or at all.
Defendant’s trial was originally scheduled to commence on August 16, '2011; however, defendant failed to appear, having fled Louisiana to the State of Georgia. Accordingly, there was an interruption of the two-year time limitation set forth under La.C.Cr.P. art. 578. Thus, the two-year time limitation established by Article 578 did not start to run anew until defendant was returned to the State of 17fiLouisiana and appeared in court bn July 16, 2012.[63] Accordingly, the State' then had until July 16, 2014 to commence trial. However, the time limit for commencement of-trial'Was further suspended by defendant’s filing of numerous pre-trial motions. Among the numerous motions filed by defendant was a July 17, motion to quash based on double jeopardy grounds. The trial court denied defendant’s motion to quash on September 18, • 2013. Thus, the time between July 17, 2013 and September 18, 2013 was suspended.- Additionally, on February 20, 2014,- defendant filed a “Motion to Adopt all Motions filed naming above Defendants on the date of May 13, 2011,” which the court granted the following day. Included within .the May 13, 2011 motions was a “Challenge to the Array of the Grand Jury, and Objection to Grand Jury” and “Motion for Change of Venue on the Basis of Pretrial Publicity.” These particular motions were not ruled on until April 17, 2014. Accordingly, the time between February- 20, 2014- and April 17, .was suspended. See State v. Rome, 93-1221 (La.1/14/94), 630 So.2d 1284 (hold.ing that the filing of a motion to change venue was a preliminary plea that suspended. rather than interrupted prescription under La.C.Cr.P. art. 580).
*532 Also, on May 19, 2014, defendant made an oral motion to recuse the trial judge and Attorney General’s Office, which was denied by the trial court the same day. See State v. Langley, 10-969 (La.App. 3 Cir. 4/6/11), 61 So.3d 747, writ denied, 11-1226, 78 So.3d 139 (La.1/20/12), cert. denied, — U.S. -, 133 S.Ct. 148, 184 L.Ed.2d 73 (2012); and State v. Vincent, 02-1452 (La.App. 3 Cir. 4/2/03), 843 So.2d 1174 (holding that a motion to recuse the prosecutor is a preliminary plea suspending time limitations for commencement of trial). Finally, on July 16, 2014, defendant filed a motion to quash asserting that the time |77limitations for the institution of prosecution and the commencement of trial had expired. The trial court denied defendant’s motion to quash on July 21, 2014. Under La.C.Cr.P. art. 580, the State had one year from these rulings to commence trial. Based on the various suspensions caused by defendant’s motions to quash or other preliminary pleas, the July 22, 2014 trial date was timely.
Despite the amount of time that passed between the institution of prosecution and trial, there was constant activity in the case and, as the record thoroughly documents, many delays were attributable to defendant. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER EIGHT

Violation of right to confrontation

In this assignment of error, defendant argues her right to confrontation was violated when she was denied the ability to cross-examine Dr. Christy Montegut, the coroner who prepared the death certificate in this case.
Dr. Richard Tracy, the pathologist who performed the autopsy on M.L., testified that he prepared a report on his findings and forwarded the report to Dr. Montegut, the local coroner for St. John the Baptist Parish. Dr. Tracy explained that among the responsibilities of the coroner is the responsibility to issue a death certificate noting the manner of death. The death certificate issued by Dr. Montegut and dated May 5, 2008 was entered into evidence by defendant with no objection. Dr. Montegut was not called as a witness by either the State or the defense.
The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution specifically and expressly guarantees the accused the right “to confront and cross-examine the | ^witnesses against him.” La. Const. art. I, § 16; see also State v. Robinson, 01-273 (La.5/17/02), 817 So.2d 1131, 1135. Confrontation does not only mean the ability to confront the witnesses physically. Its main and essential purpose is to secure, for the opponent, the opportunity of cross-examination. Id. Cross-examination is the principal way to test the believability and truthfulness of the testimony, and it has traditionally been used to impeach or discredit the witness. Id.
For the first time on appeal, defendant argues that her Sixth Amendment right to confrontation was violated by her inability to cross-examine the coroner, Dr. Montegut. First, Dr’. Montegut was not called as a witness by the State or by the defense. Defendant could have subpoenaed Dr. Montegut as a witness at trial but chose not to do so. Second, at no time did defendant raise the issue that she was denied her right to confrontation by Dr. Montegut’s failure to testify; thus, the issue was not properly preserved for appeal.
*533 To preserve the- right to seek appellate review of. an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. See La.C.Cr.P. .art. 841; State v. Smith, 11-638 (La.App. 5 Cir. 3/13/12), 90 So.3d 1114 (citation omitted).. In failing to object at trial, defendant waived the issue for appellate review. See State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583, 620-21, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Davis, 06-402 (La.App. 5 Cir. 11/28/06), 947 So.2d 48, 58-59, writ denied, 07-0003 (La.9/14/07), 963 So.2d 996.

ASSIGNMENT OF ERROR NUMBER NINE

Improper composition of the Grand Jury

In this assignment of error, defendant argues that “the. Parish of St. John, State of Louisiana, through its public assistance offices, has been violating the |79National Voters Right Act of 1993 (“NVRÁ”), which in turn had a direct impact on the composition” of the grand jury. Defendant submits that because of the parish’s deliberate violations of the NVRA, she was deprived of a constitutionally protected right to a grand jury free from “systemic” discriminatory practices which had a discriminatory effect upon the composition of the grand jury in this case.[64]
First, defendant’s brief contains no facts or argument regarding the composition of the grand jury empaneled in this case. Without this, it is unknown how and/or whether the array of the grand jury “had a discriminatory effect upon the composition of the grand jury” as defendant argues. Moreover, defendant provides no support for her blanket assertion that the St. John the Baptist Parish Clerk of Court deliberately violated the NVRA, in turn, producing a grand jury that had a discriminatory effect.
Second, for the’first time on appeal, defendant raises a new ground for challenging the composition ’ of the grand jury in this case' that was not argued before the trial court. A defendant' is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal.[65] State v. Jackson, *534 450 So.2d 621 (La.1984); State v. Alvarez, 10-925 (La.App. 5 Cir. 6/29/11), 71 So.3d 1079, 1085 (citing La.C.Cr.P. art. 841(A)).
IsnHaying failed to raise the issue regarding the alleged “deprivation of a constitutionally protected right” due to discriminatory practices by the clerk of court based on its deliberate violations of the “NVRA of 1993,” defendant is precluded from raising this issue for the first time on appeal. See State v. Evans, 506 So.2d 1283 (La.App. 2nd Cir.1987), finding that because the defendant made no objection to the composition of the jury venire, the challenged jurors, or the jurors who were seated, the defendant could not for the first time on appeal complain of denial of equal protection rights in the jury selection process. See also La.C.Cr.P. art. 419, providing that “[a] general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systemically excluded from the veni-res solely upon the basis of race.”

ASSIGNMENT OF ERROR NUMBER TEN

State pursued a bad-faith indictment and prosecution against Mr. Errol . Victor Sr., LS and Mrs. Tonya Victor, LS. The prosecution as a whole was contrary to medical evidence and gender driven to the detriment of Mr. Errol Victor. [Gender Discriminatory Motives][,]

[66]

In this assignment of error, defendant contends that the State “rested its prosecution in total absence of any effort tió present a prosecutorial case against [defendant].” Without providing citations to the record or legal citations in support of her argument, ’defendant alleges that she “was only jailed and kept incarcerated because of her efforts to render aid to her husband to prove his innocence.” She avers that this case is one of prosecutorial misconduct against her for her “activism” on her husband’s behalf, as well as a case targeted solely against him. She concludes that the case against her was a gender-based, pro-female prosecution aimed at |S1 “executing a feminist agenda” and that because there was never any real attempt by the State to prosecute her, she was convicted by virtue of her presence in the courtroom. She further argues that this prosecutorial tactic was designed to ensure the conviction of Mr. Victor.
The State argues that defendant’s assignment of error is another resuscitation of several earlier claims made by defendant, including insufficiency of the evidence. ' The State further argues that defendant’s assertion that this was a gender-based, pró-female prosecution used to ensure the conviction of the male defendant is unsupported.
Defendant’s assigned error fails to reference specific record page numbers and citations to the authorities on which, she relies to support her contentions, in violation of Rule 2-12.4(A) of the Uniform Rules of the Courts of Appeal. Nevertheless, defendant’s argument lacks merit. Defendant argues prosecutorial misconduct and “gender discrimination motives,” in the pursuit of the. prosecution of her case to ensure the conviction of her husband. Other than generally stating .that the entirety of the case against her was *535 one of prosecutorial misconduct based on gender discrimination motives, defendant fails to cite to any precise action's taken by the State in support of this contention. Additionally, the record does not support this assertion, which was not objected' to at trial nor raised pre-trial. ‘ The contemporaneous objection rule provides that an irregularity or error cannot be availed of after verdict unless it was objected to at the time of its occurrence. See La.C.Cr.P. art. 841; State v. Carter, 10-973 (La.App. 5 Cir. 8/30/11), 75 So.3d 1, 6, writ denied, 11-2060 (La.2/10/12), 80 So.3d 469. This ruté applies to claims of prosecutorial misconduct. Id. Accordingly, we find ■ defendant has waived any error based on-this claim.
UaAlso, intertwined with the alleged bad-faith prosecution effected against her, defendant avers that the verdict in this case was contrary to the law and the evidence. This argument is related to defendant’s sufficiency of evidence assignment of error addressed above.

ASSIGNMENT OF ERROR NUMBER ELEVEN

Jurisdiction and Status

In this assignment of error, defendant argues the trial court exercised “fraudulent in personam jurisdiction” over her.[67] Defendant claims .that because she is not a “corporation,” under La. R.S. 15:429 she could not be “sued” in criminal court for “statutory crimes set in place by •the legal fiction of Louisiana for the murder of its corporate commercial property ... M.L,” Defendant states that her denial of corporate jurisdiction would “leave any court ‘in want of jurisdiction’ except the United States Supreme Court, A Special Congressional Committee and/or the United Nations International Court of Justice, The World Court in The Hague, Netherlands.”
In response, the State asserts that defendant failed to raise this issue before the trial court. Thus, the State contends that because a challenge to the court’s jurisdiction must take place prior to trial, defendant’s claim is untimely.
It appears that defendant assigns as error the lack of personal jurisdiction over her in this criminal matter. La. C.Cr.P. arts. 16 and 17 recognize the criminal jurisdiction of courts. The alleged jurisdictional issue raised by defendant for the first time on appeal has not been preserved for review on appeal. The record contains no motion or judgment of the trial court regarding the challenged jurisdiction based on defendant’s lack of “corporate status” for this Court to preview. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence; Alvarez, supra; State v. Simpkins, 44,197 (La.App. 2 Cir. 5/13/09), 12 So.3d 1021, 1029, writs denied, 09-1229 (La.2/5/10), 27 So.3d 296 and 09-2009 (La.3/5/10), 28 So.3d 1004. Thus, this issue is not properly before the court on appellate review.[68]

*536
ASSIGNMENT OF ERROR NUMBER TWELVE

Defendant complains that she was brought before a court which lacked competent jurisdiction to conduct proceedings against her due to pending judicial district-wide motion to recuse all judges of the 40th JDC and because defendant denied corporate status. Defendant avers that these proceedings have root in vindictive prosecution because the D.A. and his staff were political and business enemies of defendant and the judicial process was utilized to execute personal retribution against defendant. The case before the court is a complete derivative of the twice-dismissed cases: 2008-CR-165; 2010-CR-172, (66175, 66575, 66576, 46420). A resultant acquittal from abandonment of legal appeal, res nova violation is claimed by defendant.

[69]

In this multi-faceted assignment, defendant first argues that the 2010 indictment used to charge and convict her in this case constituted res judicata. Defendant claims that the State reinstituted charges against her with no new facts or evidence after the previous dismissal of the 2008 indictment in violation of the principles of res judicata. Within her res judicata argument, it appears defendant also re-urges arguments made in several previous assignments of error. She again alleges that the re-filing of charges against her was a tactical decision made by the State to obtain a judge of its choosing.[70] Defendant also repeats that the judge to whom her case was re-allotted after the filing of the new 2010 invalid indictment lacked jurisdiction to act based on a pending recusal motion.[71] Lastly, she again | ^challenges the court’s in personam jurisdiction over her, claiming that her lack of “corporate status” rendered the trial court powerless to preside over his case.[72]
Only defendant’s non-duplicative argument regarding the alleged res judicata effect of the 2010 indictment will be addressed, as all others have been previously addressed in response to defendant’s other assigned errors.[73] '
On July 7,2013, defendant filed a motion to quash the indictment on the basis of double jeopardy.[74] In defendant’s motion, it was argued that Judge Jasmine’s granting of her motion to quash the' amended 2009 indictment on February 4, 2010 acted as a final judgment of acquittal, and thus, the re-filing of the new April 2010 indictment violated the principles of double jeopardy. It was further argued that the doctrine of collateral estoppel precluded the State from prosecuting defendant for murder since Judge Jasmine “resolved the *537 central issue of whether the victim died of natural causes or was murdered.”
The Fifth Amendment’s Double Jeopardy Clause protects against successive prosecutions following acquittal or conviction, as well as multiple punishments for the same offense. La. Const. art. I, § 15; La.C.Cr.P. art. 591, et seq. The collateral estoppel component of the Double Jeopardy Clause prohibits the State from re-litigating an issue of ultimate fact that has been determined by a valid and final judgment.[75] Ashe v. Swenson, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); State v. Cotton, 00-0850 (La.1/29/01), 778 So.2d 569, 574, reh’g granted in part, on other grounds, 00-0850 (La.4/20/01), 787 So.2d 278. A la-fact is considered “ultimate” if it is necessary to a determination of the defendant’s criminal liability. State v. Miller, 571 So.2d 603, 607 (La.1990); State v. Ingram, 03-1246 (La.App. 5 Cir. 10/28/04), 885 So.2d 714, 716, unit denied, 04-3135 (La.4/1/05), 897 So.2d 600.
The trial court denied defendant’s motion to quash, finding that the State acted in accordance with Louisiana law by obtaining a new indictment after the amended indictment was quashed and that there had been no violation of defendant’s Fifth Amendment right against double jeopardy. The trial judge’s ruling on a motion to quash should not be reversed in the absence of a clear abuse of the trial court’s discretion. State v. Love, 00-3347 (La.5/23/03), 847 So.2d 1198,1206.
The trial judge did not abuse her discretion in denying the motion to quash. As previously noted above, defendant’s amended indictment was quashed by Judge Jasmine with written reasons on February 4, 2010. Judge Jasmine determined that the indictment must - be quashed because of the “participation of the St. John the Baptist Parish Sheriffs Deputy in the grand jury process as a grand juror while wearing a shirt which openly advertised his employment with an office inherently aligned with the State.” The State filed a notice of dismissal without prejudice of all pending charges on April 6, 2010. On April 12, 2010, a newly empaneled- grand jury re-indicted defendant and Mr. Victor.
Here, defendant avers that the evidence presented to the newly empaneled grand jury was identical to the evidence upon which the prior indictment, quashed by Judge Jasmine, was based. Thus, because defendant claims that the February 4,2010 judgment granting the motion to quash was a final judgment, defendant argues that the State’s recourse was to appeal the judgment and that the obtaining of a new indictment violated her constitutional rights.
|SfiAs noted by the trial court in its reasons for judgment, when a court sustains a motion to quash, that court does not acquit the defendant of the ■ charges brought against her. “[W]hen a motion to quash is sustained, the court may order that the defendant be held in custody or that his bail be continued for a specified time, *538 pending the filing of a new indictment.” La.C.€r.P, art. 538.
'In the present matter, When Judge Jasmine granted defendant’s motion to quash, the State elected to dismiss the matter (nolle prosequi) and re-file a new indictment' based upon the findings of the newly-empaneled grand jury. The State has the power to dismiss an'indictment'without the consent of the court. La.C.Cr.P. art. 691, Such a dismissal does not' bar a subsequent prosecution, subject to two exceptions[76] set forth pursuant to La.C.Cr.P. art. 693, which are inapplicable to the present matter. Thus, the State’s pursuit of the new indictment, filed six days after the dismissal of the first" indictment,[77] was consistent with the applicable law. ■ •
Moreover, the filing of the 2010 indictment did not violate the principles of double jeopardy and collateral es-toppel because jeopardy did not attach after a nolle prosequi was entered. Jeopardy does not attach and there is no application of the constitutional prohibition until the defendant is “put to trial before the trier of the facts, whether the trier be- a jury or a judge.” United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). In a jury trial, jeopardy attaches when the jury is empaneled and sworn. Crist v. Bretz, 437 U.S. 28, 36, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24 (1978); Here, the indictment was quashed prior to the empaneling and swearing in of the jury and prior to any testimony of witnesses.
Furthermore, although defendant claims that Judge Jasmine’s ruling on her motion to quash resolved the merits of this case, thus barring “re-adjudication of a matter judicially settled,” defendant’s argument is misplaced. The ruling quashing the indictment was not based on a central issue, but rather was based solely on the court’s finding that a member of the grand jury employed by the St. John the Baptist Parish Sheriffs Department participated in the proceedings “while wearing a shirt which openly advertised his employment with an office inherently aligned with the State.” Since this matter was never considered on its merits and did not reach the critical stages required to place defendant in jeopardy, defendant’s argument' in this assignment is without merit.
Defendant also- argues that Judgb Jasmine had previously made a determination that the State’s evidence, particularly the autopsy report, did not support a finding that defendant was guilty. Defendant, however, refers to a bond hearing that took place before Judge Jasmine after the first indictment and prior to the amended indictment, wherein Judge Jasmine heard testimony from Dr. Velva Boles, defendant’s subsequently discredited expert witness, regarding her interpretation of the State’s evidence at that point in the case, solely to determine the appropriate bond for defendants. This ruling in 2008. on the motion to set bond was in no way a deter- *539 ruination of defendant’s guilt or innocence, and thus has no res judicata effect.
This assignment of error is without merit.
| ERRORS PATENT REVIEW
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990).
Although the commitment reflects that defendant was given a proper advisal of the timé period for seeking post-conviction'relief as required by La.C.Cr.P. art. 930.8, it appears that the transcript indicates the word “years” was omitted from the post-conviction advisal. Specifically, the transcript indicates that the trial court advised defendant that she has “a two prescriptive period in which to file for post conviction relief, that period to commence after judgment of conviction and sentence have become final.” The transcript prevails when there is a discrepancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983).
If a trial court fails to advise, or provides an incomplete advisal, pursuant to La.C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. See State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, unit denied, 12-2478 (La.4/19/13), 111 So.3d 1030; State v. Taylor, 12-25 (La. App. 5 Cir, 6/28/12), 97 So.3d 522, 538; State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, unit denied, 11-1753 (La.2/10/12), 80 So.3d 468, cert. denied, — U.S. -, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012); State v. Neely, 08-707 (La.App. 5 Cir. 12/16/08), 3 So.3d 532, 538, writ denied, 09-0248 (La.10/30/09), 21 So.3d 272; State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451, unit denied, 09-0158 (La.10/16/09), 19 So.3d 473.
Accordingly, by way of its opinion, we advise defendant that no application for post-conviction relief, including applications which' seek an out-of time appeal, |89shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922.

CONCLUSION

For the foregoing reasons, defendant’s conviction and sentence are affirmed.

AFFIRMED.

.Because the majority of the procedural history is not evident in the instant record, it is noted that pursuant to Rule 2-1.14 of the Uniform Rules of the Courts of Appeal (URCA) and State v. Bradley, 02-1130 (La, App. 5 Cir. 3/11/03), 844 So.2d 115, 118, Mr. Victor’s previous writ application, 10-K-892, was reviewed.

. Mr. Victor’s appeal, 15-KA-339, proceeds separately from defendant’s appeal, which is the subject of this opinion.

. Errol Victor, Jr. was also indicted, but charges against him were eventually dismissed.

. This motion is only contained in Mr. Victor’s record on appeal as it was filed by Mr. Victor's attorney, Ed Greenlee, at the time. However, at the hearing on this motion, it was clarified that the motion was filed as to both defendants, despite the mention of only Mr. Victor’s name on the written motion. Defendant's attorney Tomy Acosta noted that defendant adopted all of Mr. Victor’s motions.

. Mr. Victor was found guilty as charged of second degree murder.

. Defendant and Mr. Victor were convicted of bail jumping in reference to their failure to appear in. court for their trial in August of 2011 and subsequent absence from the State in violation of their appearance bonds.

. Notably, an oral motion for appeal, is not contained in defendant’s 'sentencing transcript. However, in Mr. Victor’s sentencing transcript he notes both his and defendant’s intent to appeal.

. Defendant represents herself on appeal after a finding by the trial court on March 25, 2015 that defendant knowingly, intelligently, and voluntarily waived her right to an appointed appellate attorney.

. M.L. Lloyd Jr., M.L.’s biological father, testified that he and defendant lived together in Tangipahoa Parish for four and a half years prior to their separation. M.L, was two years old at the time they separated; however, Mr. Lloyd remained in close contact with his son until one day when he arrived at defendant’s home to pick up his son and discovered that she was moving. Defendant would not give any information about where she was moving to. Despite attempting to locate her, Mr. Lloyd was unsuccessful and never saw his son again until he was notified four years later by a newspaper reporter of M.L.’s death. Mr. Lloyd testified that he made all of the funeral arrangements and that defendant’s other four children, Toi Williams, Brandon Williams, Cordell Williams, and Kevin O.tkins, all attended the funeral, but that defendant did not.

. Lividity was explained as the change in skin color from pooling of blood and bodily fluids after’ death due to gravity.

. The gluteal muscles are a group of three muscles which make up the buttocks.

. Dr. Tracy’s provisional anatomical diagnoses were forwarded to the St. John the Baptist Parish coroner, Dr. Christy Montegut. As coroner, Dr. Montegut issued the death certificate in this case. The first death certificate issued by Dr. Montegut on May 5, 2008, after obtaining Dr. Tracy’s provisional anatomical diagnoses, listed the cause of death as asphyxia due to neck compression, and the manner of death- was marked as "pending investigation.” After obtaining supplemental information, including M.L.'s prior medical records and toxicology reports, Dr. Montegut amended the manner of death to “homicide.”

. On the St. John the Baptist Parish Coroner’s Office form, which was required to be filled out by the hospital and sent to the coroner’s office, Dr. Morris listed the cause of death as “unknown,” but deferred to the coroner’s findings after performance of the autopsy.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).

.Detective Chauvin also reviewed video surveillance footage from the hospital security cameras. On the video, Mr. Victor’s son, Errol Victor, Jr., is seen carrying M.L.’s limp body through the ambulance bay doors, accompanied by Mr. Victor, Defendant is also seen exiting the driver’s side of a Cadillac Escalade and entering the emergency room. On the videos, both Mr. Victor and Errol Victor, Jr. then exit the triage room door, where they were met by defendant, and proceed to exit the hospital, at which time defendant and Errol Victor, Jr. drive away in the Escalade.

. Defendant informed Mr. Wilson that she was in Destrehan.

. Defendant testified that she did not know about the money in the car, but that Mr. Victor sometimes carried cash in the car.

. Dr. Benton testified that in his twenty-years .of experience reviewing thousands of child death cases, in only a minority of cases has the ultimate conclusion been that the child died from an act or commission of physical abuse.

, Brandon testified that when he was first interviewed, he did not tell the truth as to what happened "to M.L. because he was instructed not to by defendant who stated, "We're doing this for M.L.”

. At the time of trial, Cordell was eighteen years old.

. Marcus denied giving a statement to OCS wherein he stated that Mr. Victor "whipped M.L. and gave him six licks.”

. On re-direct, Marcus testified that his father had a “no whipping” policy.

. Fabian further testified that when they returned to the house, the police were not present. He stated that the police arrived a short time later. This testimony is at odds with police dispatch logs indicating that officers arrived on the scene to an empty house.

. On cross-examination, Emmanuel was confronted with his grand jury testimony during which he testified that he never saw defendant strike M.L., but that he heard it.

.On June 30, 2009, Trent drafted a handwritten statement detailing the events that took place on the day M.L. died, and in his statement, he did not mention that Brandon fought with M.L. He also provided a recorded statement to the police in July of 2009 and admitted that he did not mention any fighting that had occurred between Brandon and M.L. Trent also admitted that in July of 2009, he provided a statement to the police where he . stated that Cordell, was "just swinging" at M.L.

. This testimony was contradictory to Trent's aforementioned June 30, 2009 handwritten statement where he noted that defendant came home halfway through the family meeting conducted by defendant.

. Throughout her testimony, defendant used the words "chastised” and "whooped” interchangeably, in her July 10, 2009 statement, she stated that when she “whooped” M.L., it was with a belt on his buttocks.

. Defendant testified that M.L. was bom with bronchitis, and as a result, was kept in the hospital for a week following his birth. However, M.L. was never treated for asthma after 2003, according to medical records in evidence, a condition Mrs. Victor claimed he suffered from.

. In the various statements provided by defendant, her testimony differs as to the timing of when her husband arrived home that day.

. When the police searched the Victors’ home, the laptop computer was not at the residence. Defendant could not explain why it was missing.

. On cross-examination, defendant denied telling the social worker, Carliss Johnson, that she came home and found M.L. unresponsive so she took him to the hospital.

. The video footage taken from the hospital cameras confirm that defendant was at the hospital for two minutes and twenty seconds.

. When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court-should first determine the sufficiency of the evidence by considering all of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992); State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 834. If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Therefore, defendant's assigned error concerning the sufficiency of the evidence will be addressed first.

, The jury was instructed as to the manslaughter responsive verdict, pursuant to La. R.S. 14:31. The trial court instructed the jury that manslaughter "is Ae killing of a human being when the defendant has a specific -intent to kill or to inflict great hodily harm but the killing is committed in sudden passion or heat of blood immediately caused,by provocation sufficient to deprive an average person of his self-control and cool reflection; or the killing of a human being without any intent to cause deaA or great bodily harm when Ae offender is engaged in the perpetration or attempted perpetration, of the following felonies or misdemeanors ,.. simple battery, aggravated battery, second degree battery, aggravated second degree battery,”

. The Louisiana Supreme Court has consistently held that "the law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer.” State v. Sugasti, 01-3407 (La.6/21/02), 820 So.2d 518, 520-22.

. See Porter, supra. In Porter, the defendant was convicted of second degree murder while in perpetration of’cruelty to a three-year-old child. On appeal, the defendant argued that *506 the State failed to prove that he inflicted the fatal blow because the State did not exclude the reasonable hypothesis that the victim's mother inflicted it, The court of- appeal affirmed the conviction, finding, that pursuant to La. R.S. 14:30.1(A)(2)(b),. die State could either prove the defendant actually caused the fatal injuries or was a principal to the crime. The court further found that the victim died either while die defendant intentionally mistreated the victim by inflicting painful injuries upon her, or while the defendant had such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.

. The record clearly shows that defendant first objected to Saturday trial on Thursday, July 24, 2014, not Friday, as asserted by the State in brief.

. This appears to belie defendant’s assertion that she could not work on a Saturday.

. The court reporter noted in the transcript that on Saturday, July 26, 2014, defendant and Mr. Victor, refused to participate in the trial and ‘.‘huddled together all day murmuring unintelligibly, Mrs. Victor wearing a napkin on her head the entire day.”

. While Pride appears to be directly on point to the issue presented in the instant matter, it is important to note that the less restrictive standard applied by the Missouri Court of Appeal followed the United States Supreme Court in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which held that "states need not show a compelling state interest in order to apply neutral, generally applicable, laws to religious practices!’.!,- Boeme, however, was superseded by statute and supplanted by the mandates of the Religious Land Use and Institutionalized Persons Act of- 2000, codified at 42 U.S.C. §§ 2000cc, et seq„ which employs the "compelling state interest” standard.

. Defendant disagreed with the trial judge’s assertion. However, on the first day of voir dire, July 22, 2014, the trial court advised the prospective jurors that they would "probably work on Saturdays also.” Defendant failed to object at that time. The trial court also advised the new panel of prospective jurors on the second day of voir dire, July 23, 2014, that she would like to work on Saturday, but would entertain working late on Friday as well. Again, defendant failed to object. On the same day, after another new panel of prospective jurors was sworn in, the trial court again advised the new panel that they may be "working on Saturdays,” and asked them whether this imposition would cause them to be unable to serve on the jury. Again, defendant failed to object.

. The record as a whole reflects that defendant, throughout these proceedings, freely objected to many things at most hearings, which renders her assertion that she forgot to object on July 23, 2014 suspect.

. This timeline does not include the procedural history of the case 2008-CR-165 from 2008 when defendant was originally charged with accessory after the fact to first degree murder and cruelty to a juvenile. The information regarding defendant’s enrollment of various attorneys beginning in 2008 is not contained in the record. However, at an enrollment hearing in this case held on April 18, 2011, the trial judge laid out the procedural history with regards to attorney enrollment from the inception of prosecution in 2008. Specifically, the trial court noted that on April 3, 2008, Tregg Wilson represented defendant and Mr. Victor; on May 27, 2008, "Miss Baker” enrolled as counsel for defendant; on June 30, 2008, Wendy Williams enrolled as counsel for defendant; on November 18, 2009, Ernest Jones was enrolled as counsel of record for defendant and Mr. Victor; on *514 March 17, 2009, Mr. Jones withdrew as. counsel of record-and "Mr. Spears” enrolled for both defendants; ■ on April 21, 2009, three Florida attorneys — "Mi;. Cohen, Mr. Kohn-sari, and Mr. Rice,” — enrolled as defendants counsel of record; on September 22, 2009, Tomy Acosta represented defendant; on November 23, 2009, Lionel Bums enrolled as counsel of -record for both defendants; on March 23, 2010, Mr. Bums filed a motion to withdraw which was denied; on March 29, 2010, defendant objected to Mr. Bums’ representation at which time defendant’s request to represent herself pro se was granted; on May 13, 2010, the court appointed backup counsel for defendants; - on February 1, 2011, Mona Joseph was appointed to assist defendants in their representation; however, defendants stated,that they had retained Katherine Wilson as their attorney; and on March 4, 2011, defendants terminated Ms. Wilson as counsel of record, choosing again to represent themselves. Thus, even prior to the filing of the new indictment under which defendant was prosecuted and convicted, defendant had changed counsel thirteen times.

. The Court Order names Richard Stricks, but the court minute entry says that the court , appointed Tomy Acosta as counsel for defendant.

. Defendant took a writ to this Court on the trial court’s denial of Mr. Bums’ termination. This Court denied the writ on August 11, 2011, finding that “trial in this case is scheduled to commence on Tuesday, August 16, 2011. The Victors have sought to terminate Mr. Bums, the eighth attorney in this case, eight days-before trial, which,'in a murder case, is tantamount to the day of trial.” This Court went on to find that defendant's "attempted termination of Mr. Bums is no more than a tactic to delay the trial."

. On this day, defendant filed a pleading titled “Notice of Intent and Exception to Proceedings held by Terminated Counsel” wherein she noted that she had terminated Stephen Yazbeck for "proceeding on a course of defense without approval of aggrieved defendant and against our will, choice, organization and dignity of our personal defense” as well as arguing that counsel had "ignored, shut-out and disregarded as intelligent beings having any right to our own decisions” thus "erodfing] defendants [sic] constitutional, civil, and human rights_ Counsel has interfered with defendants significant tactical decisions and has practice [sic] SUPREMACY in the manner of century pass [sic] STAR CHAMBER and have eroded our faretta [sic] rights....”

. The record reflects that a hearing was held on January 21, 2014, but the transcript of that hearing is not included in the appellate record.

. This does not include the appointment and termination of standby counsel or the chang- ' ing of counsel prior to the filing of the 2010 indictment, which totaled- at least thirteen changes of counsel. See footnote 44, supra.

. As previously noted', this motion is only contained in Mr. Victor's record on appeal as it was filed by Mr. Victor’s attorney, Ed Greenlee, at the time. However, at the hearing on this motion, it was clarified that the motion was filed as to both defendants, despite the mention of only Mr. Victor’s name on the written motion. Defendant’s attorney Tomy Acosta noted that defendant adopted all of Mr. Victor's motions.

. Prior to the filing of the motion objecting to the allotment, on May 12, 2010, defendant filed a Motion to Recuse all of the judges of the 40th Judicial District Court. All matters pending in the trial court were stayed pending resolution of the motion to recuse, which was heard on August 4, 2010 and denied by a judge ad hoc on August 18, 2010, as noted earlier and below.

, Also, in its reasons for judgment, the trial court found that the State's motion to dismiss was actually "superfluous” following the grant of defendant’s motion to quash, the latter being sufficient on its own to dismiss the case.

. Defendant claims that true bills were returned in three existing 40th Judicial District *522 Court cases: "State v. McGee, 2009-CR-515, Div. 'B'; State v. Warren, 2009-CR-554, Div. ‘B’; and State v. Stewart, 2009-CR-387, Div. ‘C,’ ” which all kept their same docket numbers and original allotted divisions, in support of his argument that his case was the only one to be singled out and re-allotted to a new division. However, the facts and circumstances surrounding those cases are unknown and do not appear in the record.

. See State v. Reed, 95-0648 (La.4/28/95), 653 So.2d 1176, where the Louisiana Supreme Court noted that the allotment procedure at issue was one where homicide and rape cases were randomly allotted to divisions; however, divisions that had been previously allotted homicide and rape cases could not be allotted another homicide or rape case until each division had received one. At that point, the procedure would (presumably) start over again until each division had received a homicide or rape case. The court determined that this procedure violated due process by encouraging manipulation of allotments, the very sort of mischief the Supreme Court sought to end in Simpson, supra.

. Other pro se motions were filed between June 15, 2010 and the date of the recusal hearing on July 1, 2010. These motions included a "Motion to Stay Any Order for Recu-sal Hearing of All Judges ..." "Motion to Refuse Indictment without Dishonor,” "Motion to Dismiss Indictment,” "Motion for the Adoption of Pre-Trial and All Other Motions of Named Defendants,” "Motion to Refuse Court's Appointment of Public Defendant [sic] Office,” "Motion to Stay,” "Motion for Reinstatement of Bond ...,” and two motions to quash. No action by Judge Becnel, or any other judge, was taken on these motions prior to the recusal hearing.

. At the motion to recuse hearing, it was determined that Mr. Reed would represent both defendants, despite the original filing designating only the representation of Mr. Victor.

. Dr, Boles explained that a level five certification permits her to write a report giving her opinion of the circumstances and events at a crime scené.

. Dr. Boles was also questioned about her medical publications, which appear to have been written on topics unrelated to the instant matter, such as “Senior Citizen Disparity of Care,” potable water associated with disasters such, as Hurricane Katrina, and a book entitled “Salutary Action” addressing the healthcare industry, pharmaceuticals and the epidemic of obesity in America,

. In the case of Hamilton v. Negi, 2012 WL 1067857, 2012 U.S. Dist. LEXIS ’ 44409 (W.D.La.3/15/12), United States Magistrate Judge James Kirk presided over a Daubert hearing to determine whether Dr. Veíva Boles could serve as plaintiff’s expert witness in the case. During the hearing, Dr. Boles was questioned about her education, training, and experience as an expert witness and the preparation of her report, The magistrate judge concluded that Dr. Boles was unqualified to • testily as an expert because she “repeatedly misrepresented her qualifications to employers and courts of law.” Magistrate Kirk noted that Dr. Boles stated that she had earned degrees that she had not earned and claimed to have testified as an expert witness in trials in which she never participated. He further explained that Dr, Boles testified in other legal matters in which she stated she obtained a Ph.D. in pafhology, when she did not possess such credentials. One of these legal matters in which Dr, Boles misrepresented her credentials as a “Ph.D, -classical pathologist” was when defendant in. the instant matter was first charged with first degree murder: State of Louisiana v. Errol Victor, Case Number OS-165, 40th Judicial District Court, St. John the Baptist Parish. Magistrate Kirk also indicated that Dr. Boles had a history of misrepresenting her qualifications in her applications for medical staff membership and privileges. Also, according to various employment ree-ords, Dr; Boles' professional experience had been called into question. In response to a requested evaluation by Christus St. Frances Cabrini Hospital, Tulane Medical Center stated her "basic medical knowledge, professional judgment,. sense of responsibility, ethical conduct, competence, skill and ability to work with others are all 'poor.' ” Most notably, Magistrate Kirk stated that Dr. Boles had previously misrepresented her experience as an expert witness in two matters, one of which was State of Louisiana v. Errol Victor, Case Number 08-165,
*527 In Hamilton v. Negi, [2012 WL 1067897] 2012 U.S. Dist. LEXIS 44160, 09-860 (W.D.La.3/29/12), United States District Judge Dee Drell agreed with the recommendations of Magistrate Judge Kirk and granted the defendants’ Daubert Motion to exclude the testimony of Dr. Boles as an expert witness and further denied the plaintiff’s motion to retain Dr. Boles as an expert witness. ' The court found that Dr. Boles lacked the qualification as an expert and expressed its "con-stemation at Velva Boles’ apparently blatant use of misrepresentation in whatever quest she is on. We cannot discern from the record how she was recruited or wound up on Mr, Hamilton’s proposed list of witnesses. Dishonesty has no place in the qualifications of a supposed ‘expert.’ ” (Emphasis added,)

. See footnote 59, supra, regarding the detailed findings of the Hamilton case.

. Faretta v. California, supra.

. The current indictment wás brought approximately two months after the amended indictment was quashed.

. In one of the trial court’s written reasons for judgment denying defendant’s motion to quash based on the expiration of the time limitation for the commencement of trial, the court stated that defendant was returned to the State of Louisiana on July 14, 2012.

. Specifically, defendant states the following as her assignment of error; "Unconstitutional Juiy-fixing Resulting in Discrimination and Tainted Jury Pool Requiring Disqualification of All Jurors (6th, and 14 th Amend) [Motion to Quash and Contemporaneous Objection On/in the [sic] Trial Record].” [sic]

. Specifically, on February 20, 2014, defendant filed a '.'Motion to Adopt All Motions Filed Naming Above Defendants on the Date of May 13th, 2011.” Included within the adopted motions was a "Challenge to the Array of the Grand Jury and Objection to Grand Jury.” Defendant challenged the grand jury on several bases, none of which included the parish’s "deliberate violation of the NVRA” effecting an alleged discriminatory selection of potential grand jurors. Likewise, defendant was provided an opportunity to argue her motion on April 10, 2014, and to present evidence showing that the grand jury in this case was selected in violation of the law. At the motion hearing, defendant made no argument regarding the composition of the grand jury and did not present any evidence concerning the array of the grand jury. The trial court denied defendant’s motion, finding that defendant made no argument and presented no evidence concerning-the array of the grand jury. The court further noted that it is the "policy of the Clerk of Court of the Fortieth Judicial District to follow the law as set out in the Louisiana Code of Criminal Procedure for all matters involving the selection of both grand and petit juries,” and that there was no reason to believe the clerk of court did not follow the law.

. The assignment of error is reproduced verbatim from defendant’s brief.

. Specifically, defendant states the following' as her assignment of error. ‘‘When through Negative Averment of Jurisdiction ‘Status’ and ‘Jurisdiction’ Are Placed at Issue, the Burden Shifts to the Purported Party Asserting Competent Jurisdiction.”

. Defendant avers that she and co-defendant filed "UCC” forms to prove that they were not corporations. The record does contain a UCC form filed by Mr. Victor, but the record does show that this form was filed in connection with the’bail bond proceeding and not for the purpose stated by defendant in brief.

. This assignment of error is reproduced essentially verbatim from defendant's brief.

. This issue was previously addressed in response to defendant's third assignment of error.

. This issue was previously addressed in response to defendant’s fourth assignment of error.

. This issue was previously addressed in response to defendant’s eleventh assignment of error, .

. Again, defendant’s assigned error fails to reference specific record page numbers and citations to the authorities on which she relies to support his contention that the 2010 indictment violates the principles of res judicata, as per Rules 2-12.4(A)(9)(a) and 2-12.13 of the Uniform Rules of the Courts of Appeal.

. A motion to quash is a proper procedural vehicle to obtain a dismissal of a charged offense on the basis that a "trial for the offense chargéd would constitute double jeopardy.” La.C.Cr.P. art. 532(6).

. The doctrines of res judicata and collateral estoppel have been applied almost interchangeably in Louisiana’s criminal jurisprudence. Prior to Ashe v. Swenson, Louisiana adopted a theory of res judicata preventing criminal re-prosecution similar in effect to the Ashe holding. State v. Latil, 231 La. 551, 92 So.2d 63, 69 (1956); see also State v. Didier, 262 La. 364, 263 So.2d 322, 325 n. 4 (1972). Since the opinion in Ashe, however, it appears the courts have been more inclined to employ the term "collateral estoppel.” State v. Duplechin, 05-726 (La.App. 5 Cir. 1/31/06), 922 So.2d 655, 657, writ denied, 06-0475 (La.9/22/06), 937 So.2d 378.

, The exceptions to the rule that dismissal of an indictment does not bar a subsequent prosecution are as follows:
(1) A dismissal entered without the defendant’s consent after the first witness is sworn at the trial on the merits, shall operate as an acquittal and bar a subsequent prosecution for the charge dismissed; and
(2) A dismissal entered after a city court conviction has been appealed to the district court for a trial de novo, shall operate as an acquittal and bar a subsequent prosecution for the charge dismissed.
See La.C.Cr.P, art. 693.

. "[A] new prosecution for the same offense of fór a lesser offense based on the same facts may be instituted within the time established by this Chapter or within six months from the date of dismissal, whichever is longer,” ' La. C.Cr.P, art. 576.